## REED vs. THE BANK OF NEWBURGH.

Where the president of a bank had hypothecated his private stock to secure the re-payment of a loan to himself, and for the purpose of redeeming the same took from the funds of the bank of which he was president a sum of money, without authority of the board of directors, which he offered to the mortgagee of the stock in payment of the debt; *Held*, that the taking of the funds of the bank for such a purpose was a fraud upon the bank, and that the mortgagee of the stock acted correctly in refusing to receive the money, thus embezzled by the president of the bank, in the redemption of the stock.

Where a president or other officer of a monied corporation, who has the custody of its funds, appropriates the same to pay his own debts, or for other private purposes, without authority of the directors of the corporation, it is a criminal embezzlement of the fund entrusted to his care; and his creditor who receives the money in payment of his debt, knowing it to be thus embezzled, is a participator in the fraud and felony, and may be compelled to refund the money thus received.

A stockholder who has given another a proxy to vote upon his stock, even for a valuable consideration, is justifiable in revoking the proxy where it is about to be used for a fraudulent purpose.

THIS was an appeal from the decree of J. Emott, the for- <span>March 7.</span> mer vice chancellor of the second circuit, dismissing the complainant's bill with costs. The substance of the allegations and charges, as stated in the bill, appear in the report of this case when it was formerly before the chancellor upon a demurrer. (*See* 1 *Paige's Rep.* 216, *S. C.*) The answer of the defendants, which was subsequently put in, admitted the agreement of the defendants to loan the complainant $20,000, upon his note, secured by the transfer of stock in the Tradesman's Bank, to the extent of ten per cent beyond the amount of such loan, estimating the stock at its market value ; which collateral security was to be kept good to that extent, by the transfer of more stock from time to time if required by the defendants. The answer further stated that it was also agreed that the complainant should have a proxy to vote upon the hypothecated stock; and that in pursuance of such agreement 400 shares of the Tradesman's Bank stock, worth at its then market value ten per cent above par, was transferred to Hunn, the cashier of the Bank of Newburgh, who gave the complain-

ant a proxy to vote thereon. The answer denied the alleged tender of the amount of the $20,000 note in any other way than in the offer of a package of bills of the Tradesman's Bank to Hunn the cashier of the defendants, at New-York, when the election of directors was taking place in the banking house of the Tradesman's Bank, on the 3d of July, 1826, which offer was refused on the ground that it was not a legal tender. The defendants also admit- ted that Hunn revoked the proxy and voted upon the hy- pothecated stock himself at that election, against the wishes and remonstrances of the complainant. But they also stat- ed, in their answer, as the reasons why he did so, that the improper proceedings of the complainant who was the pre- sident of the Tradesman's Bank, had reduced the value of the stock in the market, and that he had violated his agreement in not transferring more stock, when applied to for that purpose, so as to keep the market value of the stock security ten per cent beyond the amount of the loan ; and also that the complainant, in connection with a majority of his associates in the direction, had entered into a conspira- cy to sell a majority of the stock and give the control of the funds of the bank to an individual whose name was con- cealed, for their own private emolument, and thereby to ruin the bank and defraud its other stockholders. The de- fendants admitted that the hypothecated stock, soon after the election of July, 1826, became greatly depreciated or reduced in its value ; but they alleged that it was owing to the various frauds against the bank, committed by the com- plainant and his associates in the new board of directors. The defendants in their answer also insisted that the complain- ant after the election of July, 1826, waived all claim against them on account of the alleged tender and the revoking of the proxy and voting on the stock, by transferring other stock to their cashier as collateral security for the original loan, in conformity to the original contract, and by ap- plying to him for further time to pay the note and promis- ing to give further security. The cause was heard upon pleadings and proofs. Upon the hearing, the counsel for the complainant did not ask for a decree allowing him to

redeem the stock upon paying the amount due on the note; neither was there any offer to redeem contained in the bill. But the complainant claimed to have a decree against the defendants for the balance of the market value of the stock, on the day of the election, beyond the amount then due on the note, and that the note should be delivered up and cancelled; on the ground that by the acts of their cashier at that time the defendants had made the stock their own.

*S. P. Staples,* for the complainant. There was a sufficient tender. The defendants converted the stock and made it their own, by the revocation of the proxy and by voting upon it, and a right of action became thereby vested in Reed, without a tender, or demand and refusal. The defendants by their conduct have rendered themselves accountable for the value of the stock on the day on which they made it their own by the revocation of the proxy. The defendants, the Newburgh Bank, cannot avail themselves of the relation in which Mr. Reed stood to the Tradesman's Bank as a justification for their conduct, nor set up his errors as a set-off for theirs.

*T. M'Kissock,* for the defendants. There is no sufficient tender established by the complainant. A tender ought to have been made at the banking house of the defendants, or at least to their agents authorized to receive the same elsewhere. The conduct of the complainant has been such that a court of equity will not entertain his complaint nor grant him any relief. If the defendants are responsible at all, they are responsible only for the stock at its lowest value. For the fall of the stock clearly arose from the misconduct and wrongful acts of the complainant while president of the Tradesman's Bank. The decision of the vice chancellor, dismissing the bill with costs, was right.

THE CHANCELLOR. From a careful examination of the facts in this case I can see no reason for disturbing the decree which the vice chancellor has made in this cause. I think the evidence shows conclusively that there was neither

a legal tender of the amount due on the $20,000 note, nor even an offer to pay the same in any thing which Hunn was authorized to accept, or could have accepted, without violating his duty to the defendants as their cashier. Although the complainant was the president of the Tradesman's Bank, and as such was entrusted with its funds, he had no right without the assent of the board of directors to take any portion of those funds out of the ordinary course of banking business and apply them to his own private purposes. And in this case, if he had succeeded in his attempt to embezzle the funds of the bank and pay his own private debt therewith, I am inclined to think he would have rendered himself liable to imprisonment in the state prison, for a violation of the act to protect banks against embezzlement by their officers or agents. (*Laws of* 1819, *p.* 314.) And if Hunn had received either the specie or the bills, knowing them to have been thus improperly taken from the funds of the bank by its president, he might also have subjected himself to a criminal prosecution under the second section of the same act. The testimony conclusively shows that the payment of the complainant's individual debt with the funds which were offered would have been a fraud upon the Tradesman's Bank. And the circumstances were such as to satisfy Hunn, or any other reasonable man, that the president of the bank was about to commit such a fraud. If the money had been received, therefore, and the stock transferred under such a state of facts, the defendants would have lost their security for the debt, as there is not the least doubt that the Tradesman's Bank could have compelled them to restore the money thus taken. I lay entirely out of view, as not material to the decision, the conflicting evidence as to the amount of bills which the complainant ran to the banking room and got at the time he made the offer. Neither is it material to inquire whether he left a check when he took the money, though it is very evident he did not; for the mere formality of leaving a check when he had not funds in the bank to meet it, or the fact that the money was handed to him by a clerk who was under his control as president, could not make the taking of the mon-

1837.

Reed
v.
Bank of New-
burgh.

ey for such a purpose an honest transaction as against the stockholders of the bank. Neither could it authorize the defendants or their agent to receive and retain the money thus abstracted, as a valid payment of the complainant's private or individual debt. Hunn was therefore right in refusing to be a participator in an act which would have been a fraud and felony on the part of the president of the Tradesman's Bank.

I think he was also right in revoking the proxy and voting upon the hypothecated stock himself; and this without reference to the question whether the agreement to give the complainant a proxy to vote upon the hypothecated stock was not void as against public policy. Hunn may have been actuated by a desire to subserve the interests of his son-in-law and his friends merely. But if there were other and sufficient reasons which would have made it the duty of the holder of the stock, as an honest man, to exercise the right of voting himself, and not to permit his proxy to be used to promote fraud and injustice, other motives which may have influenced the agent of the defendants to do his duty cannot prejudice their rights. The facts in relation to this part of the case are correctly stated in the opinion of the vice chancellor. At the time of the loan and until about the 15th of June, 1826, the bank was in good credit; its stock being then from ten to twelve per cent above par. About that time a secret negotiation was commenced and carried on by the complainant for some person who was then known to him only, and whose name he has not yet revealed, with a number of the directors of the Tradesman's Bank who held a majority of the stock. The object of this negotiation was to get the stock into the hands of this unknown person, so as to control the election of directors which was to take place in July. Those directors whose stock was hypothecated to the bank, or who had given stock notes to the extent of the par value of their stock, had secret meetings at the house of the complainant, and on the 19th of June concluded an arrangement, which was embodied in a writing, by which they authorized Reed to sell their stock at 28 per cent advance ; 10 per cent in money,

14 in Life and Fire bonds, or in post notes of the Morris Canal and Banking Company, and 4 in the dividend which was to be paid two days after the election; or notes were to be substituted in lieu of their notes which had been given for loans upon stock. And they agreed, when the 24 per cent was paid, to furnish for the purchaser irrevocable proxies to vote on the stock, and a power to transfer the stock on the payment of the last instalment, or par value thereof. This arrangement was most fearlessly carried into full and complete effect by the complainant and his associate directors. And on the 3d of July the funds of the bank were put under the control or in the power of the unknown purchaser, who permitted some of the selling directors, together with the complainant, who severally retained a few shares of the stock, to be re-elected. The other persons elected directors under this arrangement were also one-share-men, or persons who held a mere nominal interest in the bank. The result of this arrangement, as had been correctly anticipated by Hunn and those who opposed the election of these mere men of straw, was, that in less than fifteen days the bank sustained losses to the amount of more than $120,000. Checks and counter checks to a very large amount from persons who had no real funds in the bank were received, and advances were made, to persons without responsibility, upon Life and Fire bonds under orders which had no apparent connection with the bank. And as the vice chancellor justly observes, " such was the rapid downhill course of the bank under its new government that it is now quite apparent that but for the interference of the courts, acting upon the officers of the bank and its managers, nothing less than a total and disgraceful bankruptcy would have ensued." Although most of these frauds took place after the election of July, 1826, yet as they were such as might be fairly anticipated from the arrangement to sell the bank directorship to a person who was unwilling to have his name known, and whose stock notes were to be substituted for the notes of the former directors, Hunn did right to revoke the proxy and to vote himself upon the stock, with a view of defeating the iniquitious project, if possible.

As the complainant has never disclosed the name of the person for whom he acted in reference to the purchase of the stock and to the election of the new board of directors, it may fairly be presumed that he was himself the unknown purchaser and secret manager of the affairs of the bank, by whose fraud and mismanagement the subsequent depreciation of the hypotheticated stock was produced. In this view of the case he would have no claim to relief on account of the loss which has been sustained by such depreciation, even if there had been a proper application to Hunn for leave to redeem the stock and a tender of the complainant's own money on the day of the election.

The decree of the vice chancellor must therefore be affirmed with costs ; and with liberty to the defendants to apply to this court, at any time before the end of the next May term, for further directions as to any damages they may have sustained in consequence of this appeal.