CHARLES P. CURRIE and others, Appellants, v. CUMBERLAND G. WHITE, Respondent.

A contract for the purchase and sale of shares of the stock of a railroad corporation, at a specified price, "payable and deliverable, seller's option, in this year, with interest at the rate of six per cent per annum," effects a sale *in presenti*, the vendor becoming a quasi trustee for the purchaser, and the latter is entitled to all dividends accruing on such shares thereafter.

When the vendor gives notice, within the time, of his option to deliver, the rights of the parties become the same as though the time of delivery named by him had been specified in the original contract.

If the purchaser, pursuant to such notice, at the time named therein, offers and is ready to take and pay for the stock, and the vendor neglects to deliver or offer to deliver, a tender of the money is not necessary, as payment and delivery are to be simultaneous.

Assuming the power of the directors of a corporation to increase its capital stock, and to require the deposit or payment of money by subscribers to the new stock, such vendor is not bound to advance his own money for the purpose of preserving the right to the new shares which attached to the shares so sold. Unless the purchaser provides him with the means, he cannot claim that it is the fault of the vendor, that the stock purchased has not been increased.

If the purchaser makes distinct and separate demands, one for the shares purchased, with dividends accrued thereon, the other for the additional shares of new stock, he may recover the subject of the former demand, although not entitled to that of the latter. (ALLEN and FOLGER, JJ., contra.)

(Argued April 21st; decided September 5th, 1871.)

APPEAL from an order of the General Term of the Superior Court of the city of New York, affirming a judgment of the Special Term dismissing the complaint.

The plaintiffs and the defendant were stock brokers in the city of New York. Upon the 18th day of February, 1867,

they entered into an agreement with each other, and executed as evidence thereof the following instruments:

NEW YORK, 18*th Feb.*, 1867.
(1,000 shares.)

We have purchased of C. G. White one thousand (1,000) shares of the capital stock of the Hudson River R. R., at one hundred and twenty-eight per cent, payable and deliverable, sellers' option, in this year (1867), with interest at the rate of six per cent per annum ; either party having the right to call, from time to time, for deposits, to meet the fluctuations of the market.

CURRIE, MARTIN & CO.
[10 Cent Stamp.]

NEW YORK, *Feb.* 18, 1867.
(1,000 shares.)

I have sold to Currie Martin & Co. one thousand shares of the capital stock of the Hudson River Railroad Company, at one hundred and twenty-eight per cent, payable and deliverable, sellers' option, in this year, with interest at the rate of six per cent per annum ; either party having the right to call, from time to time, for deposits to meet the fluctuations of the market.

C. G. WHITE.
[10 Cent Stamp.]

On the 15th day of April, 1867, the Hudson River Railroad Company declared a cash dividend of four dollars per share upon the capital stock of said company, as it stood on the 18th day of February, 1867. And on the 15th day of October, 1867, declared another cash dividend of four dollars per share upon the same amount of capital stock.

These dividends were paid to the holders of stock on the 18th day of February, and on the 15th day of October, 1867, respectively.

On the 1st day of April, 1867, the board of directors of the Hudson River Railroad Company passed the following preamble and resolutions (among others):

*Whereas,* The stockholders of the company, at a meeting of such stockholders, called by the directors of the company, in the manner required by law, and held at the office of the company, on the 30th day of March last, did, with the concurrence of more than two-thirds in amount of all its stockholders, authorize and sanction the increase of the capital stock of the company, to the amount of thirteen millions nine hundred and thirty-seven thousand and four hundred dollars; therefore,

*Resolved,* That the capital stock of the company be, and the same is hereby increased to the amount of thirteen millions nine hundred and thirty-seven thousand and four hundred dollars.

*Resolved,* That the stock transfer books of this company be closed on the 10th day of April inst., and that the persons or parties in whose names stock shall be standing on that day shall severally, on or before the 15th day of April inst., be entitled to subscribe, at the office of the company, No. 270 West Thirtieth street, in the city of New York, for an equal amount of additional stock; that the price of the additional stock shall be fifty dollars per share, payable as follows (specifying days and amounts) :

That on the 15th day of October next, all installments being paid, full paid stock shall be issued.

*Resolved,* That where parties desire, for their own convenience, to anticipate payments, their money for any number of installments will be received, but no interest will in any case be allowed, nor will the stock be issued until the 15th day of October next.

*Resolved,* That stockholders failing to subscribe on or before the 15th day of April inst., or neglecting to pay their several installments as they severally become due, will lose all right to the additional stock, and will be deemed to have abandoned their subscriptions.

*Resolved,* That where parties desire to receive full stock on the 15th day of April inst., they may do so by paying fifty-

four dollars per share at the time of making their subscriptions.

On the 8th day of April, 1867, the plaintiffs sent to the defendant a notice, of which the following is a copy:

NEW YORK, <em>April 8th,</em> 1867.

C. G. WHITE, ESQ.:

*Dear Sir.*—On the 18th February last we purchased from you 1,000 shares of Hudson River Railroad Company stock, at 128 per cent, sellers' option this year. You will please take notice that we elect to subscribe for the additional stock, as provided in the resolutions of the company, at their meeting on the 1st April inst., and that we look to you for the same.

Very respectfully,<br>CURRIE, MARTIN & CO.

But the notice was not received by the defendant until between four and five o'clock on the afternoon of the 10th day of April, 1867, when it was too late to become a stockholder on the books of the company or to subscribe for the additional stock. The plaintiffs never furnished the defendant with the means of subscribing for such additional stock. Upon the 18th of December, 1867, the defendant served upon the plaintiffs the following notice:

NEW YORK, <em>December</em> 18, 1867.

MESSRS. CURRIE, MARTIN & CO.:

I will deliver you to-morrow 1,000 shares Hudson railroad stock on my contract, February 18th, seller this year, at $128 per share.

Respectfully,<br>C. G. WHITE.

And upon the 19th he went with the 1,000 shares of stock to the plaintiffs' office and handed them the following computation of the purchase-price:

HAND—VOL. VI.    104

Currie, Martin & Co.:　　　　　　　　*To C. G. White.*

　February 18th, 1,000 Hudson, $128 ........$128,000 00

　　　　　　　10 mo. and 1 day int., 6 per cent ..　6,421 33

　　　　　　　　　　　　　　　　　　　　$134,421 33

Certified check.　　　　　　　　―

　{ U. S. Stamp, }
　{ 　$13.44. 　}

The plaintiffs handed Mr. White the following notices, which they had already drawn:

　　　　　　　　　　　New York, *December 19th,* 1867.

Mr. C. G. White:

　We will accept the 1,000 shares Hudson railroad stock you propose to deliver to us to-day, and pay you therefor the sum stated in your account, $134,421.33, and we demand of you the cash dividends thereon and interest.

　　　　　　　　Respectfully,

　　　　　　　　　　CURRIE, MARTIN & CO,

　　　　　　　　　　New York, *December 19th,* 1867.

Mr. C. G. White:

　We require you to deliver to us, under your contract, dated 18th February, 1867, a second 1,000 shares of Hudson railroad stock, the portion of the new issue of stock by said company, on their increase of capital in April, 1867, accruing to the owner and holder of the 1,000 shares mentioned in your said contract. We tender to you the price at which said new stock was issued, with interest, $56,232, and demand and claim from you the delivery of said 1,000 shares, and the cash dividends, if any, that have been made thereon.

　　　　　　　　Yours,

　　　　　　　　　　CURRIE, MARTIN & CO.

Whereupon White went away (without anything further being done) to consult counsel as to the legal effect of the notices, and nothing further transpired except the receipt of an additional notice, as follows:

MR. C. G. WHITE: '

*Sir.*—Our checks for $134,421.33 and $56,232 have been ready for you since they were tendered you, with our two notices relative to our Hudson river contract, on the 19th inst. You then said you were not ready to give an answer, but would see about it. We are ready to do what we offered and tendered in our notices and renew our notices, but suppose your silence is equivalent to your refusal to comply with them.

Yours, etc.,<br>CURRIE, MARTIN & CO.

NEW YORK, *December* 31, 1867.

The case below is reported, 1 Sweeny, 166.

*William R. Martin,* for the appellants, cited *Couturier* v. *Hastie* (5 H. Lds. Cas., 673); 1 Pars. on Cont., pp. 102, 103; 2 Story on Cont., §§ 1023–1028); *Rensselaer Fac'y* v. *Reid* (5 Cow., 587); *Van Rensselaer* v. *Jewett* (2 Coms., 140); *Radway* v. *Briggs* (37 N. Y., 256); *Champernoun* v. *Brooke* (3 Cl. & Fin., 4); Sugd. V. & P., 806, 819; *Palmerston* v. *Turner* (33 Beav., 525); *Webster* v. *Donaldson* (34 id., 451); *Williams* v. *Glenton* ( id., 528); *Regents Canal Co.* v. *Ware* (23 id., 575); *Stewart* v. *Lawson* (3 Sm. & Gif., 307); *Courtney* v. *Ferrers* (1 Sim., 137); *Terry* v. *Wheeler* (25 N. Y., 520); *Anson* v. *Towgood* (1 Jac. & W., 617); *Vesey* v. *Elwood* (3 Dr. & War., 74); *Kimbody* v. *Tew* (5 Irish R. Eq., 389); *Davy* v. *Barber* (2 Atkins., 490); *Ackland* v. *Gaisford* (2 Mad., 28); *Small* v. *Atwood* (3 You. & Coll., 105); *Mechanics' Banking Association* v. *Spring Valley Co.* (25 Barb., 419); *Nelson* v. *Eaton* (26 N. Y., 411); *Totterdell* v. *Fareham Co.* (1 L. R. C. P., 674); *Garste* v. *Lees* (3 H. & C., 558); *Bateman* v. *Porter* (15 Wend., 638); *Warren* v. *Mains* (7 John., 477); *Crist* v. *Armour* (34 Barb., 378); *Wallis* v. *Glynn* (19 Ves., 281); *Harding* v. *Davis* (2 Car. & P., 77); *Slingerland* v. *Morse* (8 John., 370); *Bellinger* v. *Kitts* (6 Barb., 281); *Stone* v. *Sprague* (20 id., 514);

*Sears* v. *Conover* (34 id., 330); *Vanpell* v. *Woodward* (2 Sand. Ch., 145); *Dana* v. *Fidler* (1 E. D. Smith, 480); *Wheeler* v. *Garcia* (40 N. Y., 586).

*George C. Barrett*, for the respondent. The contract between the parties was executory and not executed. (1 Story on Com., §§ 18, 19; *Russell* v. *Nicoll*, 2 Wend., 112; *Outwater* v. *Dodge*, 7 Cow., 85; *Ward* v. *Shaw*, 7 Wend., 404; *McDonald* v. *Hewitt*, 15 John., 349; Story on Sales, §§ 231, 232, 296; *Boyd* v. *Siffkin*, 2 Camp., 326; 1 Par. on Con., 441, 442; 438, 439; *Goode* v. *Langley*, 7 Barn. & C., 26; 2 Kent., 468, note, 496; *Clarke* v. *Spence*, 4 Ad. & El., 448; Bell on Sales, 12; *Hanson* v. *Meyer*, 6 East, 614; *Simmons* v. *Swift*, 5 B. & C., 857; *Joyce* v. *Adams*, 4 Seld., 291; *Benedict* v. *Field*, 16 N. Y., 595, 597; *Baker* v. *Bourcicault*, 1 Daly, 24; *Russell* v. *Minor*, 22 Wend., 664, 671; *Chapman* v. *Lathrop*, 6 Cow., 110; *Decker* v. *Farniss*, 3 Duer, 316; 4 Kern., 615; *Kelly* v. *Upton*, 5 Duer, 336; *Lester* v. *Jewett*, 1 Kern., 454; *Levin* v. *Smith*, 1 Denio, 573; *Black* v. *Weble*, 20 Ohio, 304; *Stanton* v. *Small*, 3 Sandf., 230; *Turner* v. *Thornton*, 1 Com. Ben., 385.) Where the delivery of goods sold, and payment, are to be contemporaneous acts, the property, until such payment and delivery, remains in the seller. (*Bussey* v. *Barnett*, 9 M. & W., 312; *Bishop* v. *Shillits*, 2 B. & Ald., 329, n.; *Palmer* v. *Hand*, 13 John., 434; *Lupin* v. *Marie*, 6 Wend., 77; *Laidler* v. *Burlinson*, 2 M. & W., 602.) On the question of performance. (*Weld* v. *Hadley*, 1 N. Hamp., 295; *Des Arts* v. *Leggett*, 16 N. Y., 590.) On the question of tender. (*Roosevelt* v. *Bull's Head Bk.*, 45 Barb., 583; *Sanford* v. *Buckley*, 30 Conn., 344; *Wood* v. *Hitchcock*, 20 Wend., 47; *Breed* v. *Hurd*, 6 Pick., 356; *Kortright* v. *Cady*, 21 N. Y., 343; *Leatherdale* v. *Sweepstone*, 3 Car. & P., 342; *Simmons* v. *Wilmot*, 3 Esp. R., 91; *Heplum* v. *Auld*, 1 Cranch., 321; *Bateman* v. *Poole*, 15 Wend., 637; *Hornley* v. *Cramer*, 12 How., 490; *Strong* v. *Blake*, 46 Barb., 227.)

RAPALLO, J.  By a stock contract such as this, the seller of shares deliverable at a future time assumes to have them, and to make a present sale of them, and to hold them for the benefit of the purchaser until delivery.  The language of the contract imports a sale *in presenti*, and charges the purchaser with interest on the purchase-money, from the time of the sale to the time of delivery.  If the seller, for speculative purposes, takes the chances of acquiring the shares in time for delivery, or if, having the shares at the time of sale, he deals with them till the time for delivery, he acts at his own risk.  The purchaser cannot know whether the seller has the shares or not, nor do his rights depend upon that fact.  They are the same as if the seller had the shares on hand, which he pretends to sell, and made a present sale of them, postponing simply the actual delivery, and keeping them on hand in the mean time.  On this theory the purchaser pays interest on the purchase-money.  He is, therefore, entitled to dividends accruing between the sale and the delivery.  The plaintiff's right to these dividends seems to have been conceded by the defendant, at the interview of the 19th December.  By the notice of December 18th, the defendant exercised his option as to the time of delivery, and appointed the 19th for that purpose.  The time for delivery then became fixed, and the rights of the parties were the same as if the 19th of December had been appointed by the original contract for the delivery of the stock.  On that day the plaintiff offered to the defendant, in writing, to take and pay for the 1,000 shares of original stock, and demanded the dividends thereon.  The defendant's conduct in taking away this written offer and the stock, and not returning any answer to the offer, was equivalent to a refusal to perform.  His previous statement, that he would deliver the stock and allow the dividends, was nullified by his subsequent conduct, in going away without offering the stock, and not returning any answer to the written proposition.

The plaintiff's offer, on the 19th, to take and pay for the original 1,000 shares, was absolute, and entirely separate from

his further demand for the 1,000 shares of additional stock. He did not make the delivery of the latter shares a condition of accepting and paying for the original shares. He evidently designed to perform as to the original shares, and still reserve his claim for the additional stock, but to keep the two subjects distinct and separate. It may be that he could not have accomplished this purpose, and that if he had accepted the .original shares, with their dividends, he would have been barred from any further claim under the contract. He took his chances on that question, but made no reservation or condition which impaired the validity of his offer to perform as to the 1,000 original shares.

A tender of the money was not necessary; the payment and delivery were to be simultaneous. The offer and readiness to pay were sufficient, and by failing to respond to that offer the defendant dispensed with the necessity of a formal tender. The plaintiff showed that he was ready to pay, having made an arrangement with his bank to certify his check for the required amount on that day, and having prepared the check at the time of making the offer, for the precise amount of the statement furnished by defendant. If the defendant had said that he would deliver the stock on payment of the money, then it would have been necessary to tender it; but instead of that, he said he would go and consult his lawyer, and he went away, taking the stock with him, and did not return or send any answer. This constituted a refusal to perform.

I think the plaintiff was entitled to judgment for the difference between the contract price and interest and the market value of the 1,000 shares of stock on the 19th of December, with the two dividends thereon. As to the claim for the additional stock, I concur in the conclusions of my learned brother FOLGER.

I think the judgment should be reversed and a new trial ordered, unless the defendant shall consent to a judgment for the proper amount to cover the claim for the non-delivery of the original 1,000 shares and cash dividends.

FOLGER, J. (dissenting.)   The contract betwen the parties
is an agreement for the sale of shares of stock, the shares to
be delivered in the future, and the purchase-price then to be
paid with interest.   This contract was executory.   (*Kelley* v.
*Upton*, 5 Duer, 336.)   But by virtue of it the vendor became
a trustee, *sub modo*, of the shares, for the vendees, and they
became the *cestuis que trust, sub modo*, thereof.   (Hill on Trus-
tees, 259, 170, 171.)   The rigid letter of the contract might
perhaps be met by a delivery of 1,000 shares of capital stock,
however changed in their proportion to the whole number
issued by the company, from the time of the contract to the
time of the delivery.   But the parties meant more than this
by their contract.   The one meant to buy and the other
agreed to deliver these shares, with all the rights which
attached to them at the time of making the contract.   One
of these rights was to take new shares, upon any legitimate
increase of the capital stock, which right attaches to the old
shares, not as profit or income, but as inherent in the shares
in their very creation.   (*Atkins* v. *Albree*, 12 Allen, 359 ;
*Brander* v. *Brander*, 4 Ves., 800, and notes, Sumner ed.)

When, on the 19th December, 1867, the defendant was
ready to deliver the 1,000 shares, this right had been severed
from them ; it had been exercised and no longer attached,
and could not be transferred with the shares to the plaintiffs.
There had been but one mode of retaining or exercising it to
the advantage of the shares.   That was by subscribing for the
new stock.   But to do this required a deposit (we will allude
but to one mode of making payment) of fifty dollars per
share.   This requirement was made by the directors of the
company.   We will for the present assume that they had the
power to do this and the acts accompanying it ; for, if they
had not, then the issue of new stock is illegal, and there is no
question upon this part of the case between the parties.
Upon whom did the requirement place the burden of advanc-
ing the money for this payment or deposit ?

It is held (*Faulkner* v. *Hebard*, 26 Vt., 452) that the ven-
dee of stock in a corporation is bound to know what the

directors may do; and that what they may do, therefore, forms one of the contingencies of his purchase. And see *Moore* v. *Hudson R. R. R. Co.* (12 Barb., 156). All purchases of stock to be delivered at a future day must be understood to be made subject to the exercise of all the legal powers of the directors. (1 Redf. on Railways, 198, and cases there cited; *Preston* v. *Gwynne*, 10 Law Jour., N. S., Chanc., 72.) The vendees in this case were affected by this principle, and though they meant to buy the right to take new stock, they contracted for it, subject to the conditions which the directors might attach to its exercise. And if they wished to preserve for the shares which they had agreed to buy the right to the new shares, they should have enabled the defendant to have complied with the requirement. He was, doubtless, bound to deliver to them the shares. They were the substantial thing, and the right to new stock, though attached and inherent, was at the time of the contract contingent. He had no funds of theirs, no funds of his trust in hand. He was not bound, from his own funds, to make advances to preserve this right, when the contingency arrived. His position was not more onerous than that of a trustee expressly created. His duty was not to preserve the subject of the trust by an expenditure of his own means. (Lewin on Trusts, 605, margin, 764.) He may not by his act cause, nor by his neglect suffer from the act of another, detriment to be done. But where to preserve requires the use of money, he is not obliged to advance it from his own. See *Murray* v. *DeRottenham* (6 J. C. R., 52). It might be, that if the *cestui que trust* was ignorant of the emergency, it would be the duty of the trustee to notify of it. But where, as in this case, the *cestui que trust* was informed, and alive to the necessity, giving notice to the trustee, the duty is not upon the trustee either to advance or to ask for funds. In a case of a contract of sale of shares of stock, so far executed as that payment of the purchase-price has been made, but the certificate therefor still undelivered, the vendor is not bound to pay calls upon them, made by the directors of the company before

actual delivery. (*Brigham* v. *Mead*, 10 Allen, 245; and see *Weald of Kent Canal Co.* v. *Robinson*, 5 Taunt., 801; Lindley on Part., 448, 449, margin, 544.) If then, it was not the duty of the vendor to advance the money to make good the subscription for the new stock, the plaintiffs could not hold him in default for not doing so. But they have proceeded upon the theory that it was. And in so doing they have failed in offering due performance on their part, without which they could not put him in default. Inasmuch as they did not furnish him the money with which to make the payment on the new stock, he is not in fault, that the stock, of which he was in a manner their trustee, has not been increased. He is able to render to them the subject of the trust, as it was received by him, not lessened in value by any act or neglect of his. But they demand of him more. To put him in default for not delivering the original 1,000 shares, it was incumbent on them to offer to him the purchase-money and interest, and to ask from him a delivery of the 1,000 shares with the profits on it which he had received. Had he refused, their right of action for so much would have been perfect. But they went beyond this; their demand was greater. They required of him the original stock; the profits upon it, being two dividends; the increase upon the shares of new stock issued, and the dividend upon that. To this they were not entitled. He had the right to decline. And so we perceive from the papers in the case, that the learned judge who tried the case, has not found in affirmative terms, that the plaintiffs ever performed the contract or offered to perform. He seems to have taken care to avoid so finding. He finds that, if there was any offer by them to perform, it was on the 19th or on the 31st of December, 1867, and at no other time or times. On the 19th December, the demand was the same. And there was no offer on either day to perform on any other basis. A compliance with this demand, on the part of the defendant, was asked for before they would pay him the purchase-price and the interest.

Unless as trustee, *sub modo*, the defendant was bound to advance the money to make effectual a subscription for the increased stock, then the plaintiffs required more of him than they were entitled to, and making his compliance with their demand the condition of performance of the contract by them, their right of action has not accrued. I hold, that the duty of defendant as trustee was fulfilled by preserving the subject of the trust in the condition in which it came into his hands, by receiving and accounting for all the profits which accrued from its ordinary use, but that he was not bound, with or without notice from the plaintiffs, to make advances from his own funds to add to the value of the subject, or to change its condition, or to avail of the benefit to it to be derived from the acts of others, of which payment of money was a condition. And in whatever aspect of the case it is viewed, this consideration is controlling. In no event, properly resulting from this contract, was this defendant bound to advance the money, to fulfill the condition on which a subscription for the increase of stock could be made. And as no offer of performance was ever made by the plaintiffs, which did not require the defendant to act as if he were so liable, and as an offer to perform on their part was needful to put the defendant in default, they have made no offer of performance which has made the defendant liable to them in this action. As this one position is decisive o this appeal, I do not present views on other important questions made in the case.

The judgments of the courts below should be affirmed, with costs to the respondent.

ALLEN, J. (dissenting.) The undertakings of the respective parties to the contract were dependent, and the acts they were bound to perform were concurrent and reciprocal. (*Bank of Columbia* v. *Hagner*, 1 Peters, 455; *Dana* v. *King*, 2 Pick., 156; *Johnson* v. *Wygant*, 11 W. R., 48.) The plaintiffs could not call upon the defendant to deliver the stock except upon payment of the agreed price, neither could

the defendant claim the money except upon a transfer and delivery of the stock. The acts of the parties in the performance of the contract were to be simultaneous, the agreement not contemplating a credit to either. Neither could put the other in default, except by performance or a tender of performance on his part, and a recovery cannot be had for non-performance of the contract, unless an actual performance or tender of performance is averred and proved by the party alleging a breach by the other. (Cases cited above; *Lester* v. *Jewett*, 1 Ker., 453; *Jones* v. *Marsh*, 22 Vermont, 144.) It was not claimed that there was actual payment, or any tender of money. The only offer was of the checks of the plaintiffs. The check for the 1,000 shares named in the contract at the agreed price was for $134,421.33, and the other check offered was for $56,232, amounting in the aggregate to $190,654.33. It was admitted on the trial that, on the 19th day of December, the plaintiffs had not in any bank or banks money standing to their credit sufficient to meet the checks they had drawn, and that, on the 31st of December, they had not funds in any bank or banks standing to their credit to meet the checks offered to the defendant, and that they had not, on either of the days named, a sum exceeding $50,000 standing to their credit in any bank or banks in the city. Aside from every question of tender, the plaintiffs were not ready or in a condition to perform the contract on their part. These checks did not represent, and were not drawn against moneys on deposit. The smallest of the checks was not good as representing funds against which it was drawn. All the cases agree that a readiness, as well as an offer, to perform, must be shown by the party seeking to put the other in default.

The readiness to perform a contract calling for the payment of money, recognized by law, is the actual possession of or control of the money, as owner or with the right of disposal for that particular purpose. (*Hammond* v. *Gilmore*, 14 Conn., 479.) Ability and readiness to pay was a fact material to be proved by the plaintiff upon the trial. SPENCER, J., in *Porter*

*v. Rose* (12 J. R., 209), says : " Where two acts are to be done at the same time, as where one agrees to sell and deliver, and the other agrees to receive and pay, an averment by the purchaser, in case he sues for the non-delivery, of a readiness and willingness to pay is indispensably necessary ; and consequently the readiness and willingness to pay is matter to be proved on his part, whether the other party was at the place, ready to deliver the thing contracted for, or not." The case cited was disposed of upon the application of this doctrine.

To the same effect is *Topping* v. *Root* (5 Cow., 404), and the principle has never been questioned. (See *Bronson* v. *Wiman,* 4 Seld., 182 ; *Lester* v. *Jewett, supra.*) There was no evidence that the checks would have been paid. There was no proof, or offer to prove such fact ; neither was there any request to the referee to find that the checks were the equivalent of money, or would have been paid on presentation. It will not be assumed that checks drawn without funds to meet them will be paid. On the contrary, the presumption is in accordance with the law that, as checks available for obtaining money, they are worthless, whatever their value as the obligations of responsible persons may be. The bank was under no obligation to honor them, and the presumption is they would have been dishonored. But it is enough that there was not, at the time of the offer, a readiness and an actual ability to take and pay for the stock shown. This is essential, aside from every question as to the form and efficiency of the tender. The plaintiffs did not have the money during either of the days referred to.

The plaintiffs recognized the necessity of proving a readiness and ability to pay by the evidence they gave in respect to the certification of the checks. The evidence is not satisfactory for the purpose for which it was given, as it comes far short of proving that, on the 31st of December, the bank would, without funds, have come under an obligation for near $200,000, and there was an entire absence of evidence that any officer of the bank had authority to certify checks as good when the drawer was not in funds. There was not even evi-

dence that, in the course of business in that bank, the president was in the practice of certifying checks, or transacting other business usually performed by cashiers, or that circumstances existed which would have estopped the bank from denying the authority of the president, and repudiating the certificate, so as to make the check valid as an obligation of the bank in the hands of the defendant. An authority to pay a check without funds of the drawer, or to certify it as good when there are no funds to meet it, will not be presumed, and a certification under such circumstances only binds the bank by way of estoppel, and to prevent a fraud upon innocent holders. It is not intended to impute fraud or a fraudulent intent to the plaintiffs in procuring these checks to be certified, although without funds at the time to meet them, as they might have been reasonably certain of being able to make provision for their payment before, in the course of business and transmission through other banks, they could be presented; but the confident expectation or reasonable certainty of an ability to provide in the future, is not the equivalent of a present readiness and ability to pay. A certification of a check, without funds on deposit, is irregular, and it may be questionable whether a party might not properly refuse to receive a check thus certified, upon the principle of *Reed* v. *Bank of Newburgh* (6 Paige, 337). But a certified check is not money, or if funds are not on deposit to meet it, the representative or equivalent of money. It is but an obligation of the bank to pay, or rather to make good its representation. If the defendant should consent to receive it in payment, he might do so, but he was not bound to receive it, and, therefore, the ability to procure, or even the possession of a certified check, it being admitted that the drawer had no funds, or not sufficient funds to meet it, would not be evidence of the plaintiff's ability to pay the money. On the contrary, it would be evidence of his inability; and a possession of the check, thus certified, would simply be evidence of the ability of the plaintiffs to induce the bank to become security for the payment of the debt, for this is the legal effect of the trans-

action.　Again, as before suggested, a certification of a check is only an admission of a fact, to wit, that the drawer is in funds, applicable to its payment, and, if untrue, may be contradicted, and binds no one except in favor of one who has acted and parted with value on the faith of it.　Had the defendant received the check with knowledge of the truth, the certificate would have added nothing to the value of the check, and a paper that only has value from a concealment of the truth is valueless, and for all purposes the checks, certified or uncertified, should be treated according to the value they intrinsically had, under the circumstances as they actually existed, assuming as we must, that no factitious value would be given to them by withholding the truth.　The defendant's ability to enforce a check, certified without funds, against the bank, would depend upon the evidence of his knowledge, and it is but equity that he should have the benefit of the truth in resisting any claim founded upon an untruth.　If it be conceded that he made no objection to receive a check, and waived the right to demand lawful money, yet he did not, by such act, waive the right to demand a check good as drawn against an actual deposit.　A party giving a check, in effect, represents that he has money on deposit to meet it.　He did not receive it; and when the plaintiffs sue for a breach of the contract, this assent to the form of payment, by check, does not dispense with proof that the check was good, and that the plaintiffs were then able and ready to pay the money, either upon the check or the original contract.　But the evidence of ability to pay, even by a check certified by the officers of the bank, is insufficient and unsatisfactory.　The fact was not proven so conclusively that it was error not to find the fact.　The evidence was slight, but perhaps sufficient to raise a question of fact for the jury or other tribunal having the trial of issues of fact.　It is true, one of the plaintiffs and one of the clerks say the checks would have been certified on the 31st of December, but, so far as the case discloses, this is based entirely on an interview between the same plaintiff and the president

of the Tenth National Bank, on the 18th of December, when it was expected the transaction might be concluded the next day. The evidence is that, on being told by this plaintiff that he should probably want to draw these amounts the day following, and that it would be an unusual overdraft, the president told him he would certify the checks. He never applied before to the president to certify checks, and there is no evidence that the president ever certified a check for any person. This promise, if authorized, bound no one, and the plaintiffs gave no evidence that the president remained of the same mind on the 31st of December, nearly two weeks thereafter, and the checks never have been certified. A jury, or the referee, might well have found that the allegation, that the checks would have been certified, was not proven. The plaintiffs did not prove that they were able and willing to take and pay for the stock on the 31st of December, and for that reason the complaint should have been dismissed. But, secondly, there was no sufficient tender and offer of performance to put the defendant in default. It is agreed that the plaintiffs were in no condition to demand, and had no legal right to claim the additional stock, created and issued under the action of the directors of the railroad corporation in April, 1867. Leaving out of view the dividend on the shares which the plaintiffs claim, under their contract, they were entitled to the delivery of 1,000 shares of the stock of the Hudson River Railroad Company, on the payment of $134,421.33, and this was the extent of their legal right. In considering the sufficiency of the tender, it should be remembered that the parties were dealing at arms' length, neither making concessions or waiving any claim, but each standing on their strict legal rights. The plaintiff, Martin, says he did not think the defendant would accept the checks; and the formal manner in which the plaintiffs approached and communicated with the defendant, together with the wary and cautious bearing of the latter on each occasion, making no answer to any claim made upon him further than that he did not understand the effect of the propositions, and would see,

or that he would see his lawyer, in connection with the fact that ·the contract, as interpreted and insisted upon by the plaintiffs, if performed, would involve the defendant in a heavy loss, negative all idea that the defendant intended to ˙waive any, the most strict and technical, legal right, or that the plaintiffs understood him as waiving or conceding anything. The general rule is, that, to make a legal tender, there must either be an actual offer of the money produced, or the production of the money must be dispensed with by the express declaration or an equivalent act of the creditor. (*Thòmas* v. *Evans*, 10 East, 101; *Bakeman* v. *Pooler*, 15 Wend., 637.) If anything but money is offered, the tender will not be effectual for any purpose, unless the creditor in terms, or by clear implication by some act equivalent to an express declaration, waives all objections to the quality or character of the tender. Perhaps an objection to receive the tender upon another distinct and specific ground would be regarded as evidence of a waiver of an objection· to the quality of the tender; upon two grounds: 1. The statement of one objection may be regarded as evidence of an intent to waive all others, on the principle of *expressio unius est exclusio alterius.* 2. A statement of one objection which cannot be obviated, and a silence as to an objection which can be obviated, will operate to mislead the debtor, unless the creditor is held to the objection taken. By taking one objection, he induces the debtor to act upon the belief that there are no others, or that all others which could be taken are waived. (*Carman* v. *Pultz*, 21 N. Y., 547; *Haskell* v. *Brewer*, 2 Fairf., 258.)

The cases in which the creditor has been held to have waived, by implication, the objection to the quality of the tender,· and dispensed with a tender of money, are those in which the debtor has refused to receive the tender on the express ground that the amount was insufficient. (*Polglass* v. *Oliver*, 2 Cr. & Jr., 15; and cases cited in note to Am. ed.) The mere passive refusal to receive a tender, or rejection of it without assigning a reason waives nothing, and leaves the party to

justify his refusal upon any ground recognized by the law. In *Dunham* v. *Jackson* (6 W. R., 22), in the Court for the Correction of Errors, the rules relating to a tender upon money contracts were carefully considered, and Judge MARCY, in the only opinion delivered, and which was concurred in by the whole court, protests against any relaxation of the rules upon that subject which will render it a matter of uncertainty what shall constitute a tender. He says, in such an event, "nothing will have been gained." "Rigid rules are, upon the whole, better than uncertain ones," and cites, with approval, *Thomas* v. *Evans* (10 East, 101), and *Kraus* v. *Arnold* (7 J. B. Moore, 59).

*Dunham* v. *Jackson* was a bill to redeem stock from a pledgee, and the parties had come together for the purpose of redeeming. A broker attended to receive a reassignment of the stock and pay what should be found due the pledgee, and, after the amount was agreed upon, being requested by the agent of the pledgee to draw his check for the amount, took out of his pocket-book a blank check for the purpose of filling it up, but was interrupted by the pledgee observing "let it be done to-morrow," and demanding a larger sum than the amount liquidated; and it was held that these circumstances did not amount to a tender, and that the bare refusal to receive the sum due and the demand of a larger sum, were not enough to excuse the actual tender of the money. Chancellor KENT's decree, holding the tender and offer insufficient, was unanimously affirmed. In *Thomas* v. *Evans* (*supra*), the defendant had left £10 with his clerk for the plaintiff, of which the clerk informed the plaintiff when he called and demanded a larger sum, and the plaintiff said he would not receive the £10 or anything less than his whole demand; and it was held that this did not dispense with the actual production and offer of the money. In *Kraus* v. *Arnold* (*supra*), the agent of the debtor offered to pay to the clerk of the debtor's attorney £7 12s., saying that one Tenson had the money for that purpose, but the clerk demanded £8. Tenson was present, and put his hand in his pocket to take out his

pocket-book to pay the £7 12s., but the agent of the defendant desired him not to do so, as £8 were demanded. The court held there had been no legal tender, and that the money should have been produced, "when, perhaps, the clerk might have been tempted to take it." Within the cases cited there was no legal tender or offer to perform the contract by the plaintiffs. There was no production or offer of money, and there was no act or declaration of the defendant dispensing with its production, and consenting that the checks tendered should, for any purpose be regarded as money. He did not waive the objection to the quality of the tender. Very possibly, had bank notes, which are a part of the currency of the country and pass as money, been offered, and not specially objected to, the tender might have been sufficient in that respect; but it is not necessary to consider that question, as no money was present or offered, and the cases recognize a broad distinction between bank notes of the character mentioned, and bills of exchange, checks and other instruments, which are mere securities or documents for debts. (*Miller* v. *Race*, 1 Bur., 457; *Bank of the U. S.* v. *Bank of Georgia*, 10 Wheat., 333, per STORY, J.; *Wright* v. *Reed*, 3 T. R., 554; *Snow* v. *Perry*, 9 Pick., 539.) The plaintiffs did not in any form offer or propose to pay the money. On the contrary, they limited their offer to the checks, only proposing, and that equivocally, in case the checks were objected to, to get them certified. By thus restricting their proposal, they indicated very clearly not only the extent of their ability, but the limit of their intentions, and their action was equivalent to an express declaration that they would do nothing more than deliver the checks. It would seem that the proposition was to get the checks certified after the delivery of the stock. The clerk swears that he told defendant that he would get the checks certified if he required it; that defendant made no reply, and he added, "if he would transfer the stock." The defendant was not required to state his objections to the proposal, and he did not. He avoided a direct answer and left the plaintiffs, without saying or doing anything to mislead them, to

take such action as the law prescribed, if they desired to lay the foundation of an action by putting him in default. (*Bakeman v. Pooler, supra.*) The defendant did not give the stock for the checks; he did not refuse to perform the contract or to do any act, save only to exchange the stock for the checks. *Non constat,* that, upon the production and offer of the money, he would have transferred and delivered the 1,000 shares agreed to be sold. He did not say he would not. There is still another objection to the tender, fatal to it as the foundation of an action against the defendant. The offer to receive and pay the agreed price for the 1,000 shares was not an unqualified, unconditional offer.

The remarks of Judge COWEN, in *Wood* v. *Hitchcock* (20 W. R., 47), are appropriate to this case. He says: "The books are sufficiently nice as to the manner of a tender, but I think the case at bar shows that they are not so without reason. The person making the tender may avoid all implication against the idea of a qualification, or other circumstance destroying his tender, by making it in writing, and even negativing that it is on any condition or reserve, or intended to prejudice the plaintiff's further claim." If the acts of the person making the tender are ambiguous or of doubtful import it is his fault, and they are to be construed most strongly against himself. It is well settled by authority that a tender must be unconditional; that no condition must be annexed to it which the creditor can have any good reason for objecting to. There must not be anything raising the implication that the party making the tender intends to demand, as a condition of the tender, anything to which he is not entitled. (*Wood* v. *Hitchcock, supra ; Brooklyn Bank* v. *De Grauw,* 23 W. R., 342.) He may not require as a condition a receipt or an indorsement of the payment upon an obligation. (*Eddy* v. *O'Hara,* 14 W. R., 221; *Thayer* v. *Brackett,* 12 Mass., 450; *Loring* v. *Cooke,* 3 Pick., 48; *Richardson* v. *Boston Chemical Laboratory,* 9 Met., 42.)

The referee has found as a fact, that there was no offer by the plaintiffs to take and pay for the 1,000 shares, dis-

tinct and independent of a demand for another 1,000 shares and for two dividends on 2,000 shares; in other words, that the offer was conditional and connected with a demand, to which the defendant had a right to object. If there was any evidence in support of this finding, it is conclusive in this court, and cannot be reviewed. Whenever there is ambiguity or question as to the intent of the party making a tender, growing out of his acts and declarations and the circumstances attending the transaction, the question whether the tender is conditional or unconditional is one of fact for the jury, and not of law for the court. Where the debtor's agent told the creditor he had called to tender £8 in settlement of his account, and the creditor answered that he would take nothing less than the bill for £19, which the debtor's agent produced at the time, it was held that it was a question for the jury whether the tender was conditional or unconditional. Lord DENMAN, Ch. J., said "there was enough of ambiguity to make the matter fit for a jury;" and to the same effect is *Marsden* v. *Goode* (2 C. & K., 133), in which the question was whether a check was tendered in full payment of all claims and unconditionally. Here was enough of ambiguity to carry the case to a jury, and in such case the finding of the referee concludes this court. The evidence not only supports the views of the referee, but a report that the tender and offer were unconditional would have been against evidence. The interview of the 19th of December may be referred to as throwing light upon and aiding in the right understanding of the transaction of the 31st December. It is true that no tender of performance was then made by either party, so as to put the other party in default. (*Dunham* v. *Jackson, supra ; Leatherdale* v. *Sweepstone*, 3 C. & P., 342.) But the acts of the plaintiffs indicate very clearly their views of their rights under the contract, and the purpose and object of their subsequent offer. Upon that occasion, when the defendant offered to transfer the 1,000 shares on receipt of the agreed price, he consented, on the suggestion of the plaintiffs, to take off the cash dividends,

if the plaintiffs would indorse his certificates in the trust company, which would have enabled him to withdraw his deposits. This would have closed the contract, giving the plaintiffs all they claimed in respect to the original shares contended for. This they virtually declined, and immediately delivered to the defendant the two papers making distinct demands, one for the original 1,000 shares and the cash dividends thereon, and the other for 1,000 shares additional stock. They were handed simultaneously, and as demands then due upon a single contract. The one only claimed as incidental to and dependent upon their right to the other, and having no foundation except upon the obligation to transfer the original shares. The demand was necessarily single, and in whatever form presented, its nature was not changed. The obligation of the defendant to transfer stock, whatever its extent, was a single obligation, not capable of being severed by the act of the plaintiffs, and they did not undertake to sever it. The fact that separate checks were proposed, and were subsequently offered for the two amounts, did not vary the effect of the transaction, as a single offer, and a single demand upon the defendant to fulfill his obligation as interpreted by the plaintiffs. The transaction of the 31st of December was in harmony with this view. On that day the two checks were offered at the same time, as a performance of the one contract by the plaintiffs, and one letter was handed to the defendant as the demand, the condition upon, and purpose for which the checks were offered. In that note the plaintiffs say: "We are ready to do what we offered and tendered in our notices and renew our notices." They renew them in a single breath and the offer was of the two sums together, and the demand upon the defendant was single, although of two distinct thousand shares, and as if in words the plaintiffs had said to the defendant, "we offer you two checks, one for $134,421.33, and the other for $56,232, the one being the contract price for 1,000 shares of Hudson River railroad stock, and the other the cost, and interest on the cost, of an additional 1,000 shares, to which

we are entitled under our contract, and in payment for these 2,000 shares, and which we now require you to deliver to us under your contract." It is very certain that the plaintiffs did not indicate that the defendant was at liberty to accept one check, and transfer one part of the stock demanded, and refuse the other, and such was not the legal effect of the offer. Had the plaintiffs transmitted the checks by mail, with the letter of 31st of December, the defendant would have been bound to accept both, and perform the entire demand ; accept the proposition as made, or reject it. He could not legally have separated it, and acceded to one part of the proposition and retained one of the checks, and repudiated the residue. The plaintiffs might well have said, " we made you no such offer as you have assumed to accept." Upon the evidence the tender was conditional and therefore void.*

For these reasons, as well as those assigned by Judge FOL-GER, I am for an affirmance of the judgment, with costs.

CHURCH, Ch. J., GROVER, ANDREWS and PECKHAM, JJ., concur with RAPALLO, J. ALLEN and FOLGER, JJ., for affirmance.

Judgment reversed and new trial granted, unless the defendant consents to a judgment against him for $1,453.67.

---

*NOTE.—The right of the directors to increase the capital stock was not passed upon by the court. (REP.)