(112 App. Div. 688)

### ROWE v. WHITE.

(Supreme Court, Appellate Division, Fourth Department. May 2, 1906.)

1. CORPORATIONS—STOCK—DIVIDENDS—SELLER AND BUYER OF STOCK.

Where the owner of corporate stock gave an option agreeing to sell it to defendant or to a corporation he might indicate, and at defendant's request delivered it to a corporation, a dividend declared after the option was given, but before the sale was consummated, belongs to the original owner, and not to defendant, notwithstanding a transfer of the stock by the corporation to defendant by indorsement dated back, at defendant's direction, to a day prior to the declaration of the dividend.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, § 569.]

2. SAME.

Where the owner of corporate stock gave an option by which he agreed to sell it within six months at defendant's request to defendant or to a corporation he might name, and the defendant made a written request that it be sold to a corporation, but with the understanding that he should not assume any responsibility for the purchase price till certain conditions were complied with, and this request was accompanied by a request for a commission, it was not in pursuance of the option, so as to deprive the seller of his right to a dividend declared in the meantime by relating the sale back to the date of the option.

Appeal·from Trial Term, Wyoming County.

Action by Elmer E. Rowe against Archibald S. White. From a judgment in favor of plaintiff, defendant appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

R. Floyd Clarke, for appellant.

Frank W. Brown, for respondent.

NASH, J. The plaintiff brings the action as the assignee of Edward D. Gardiner to recover money had and received by the defendant as a dividend upon 120 shares of stock of the Empire Dairy Salt Company, which it is claimed by the plaintiff was owned by his assignor at the time the dividend was declared. The defendant claims that he was at that time the owner of the stock, having purchased it of Gardiner. The facts are undisputed. In the early part of the year 1899 the defendant was engaged in the purchase of the stock and properties of certain salt companies, for the purpose of forming a corporation embracing the properties of the companies entering into the combination, to be known as the National Salt Company. In furtherance of that purpose, the plaintiff in the month of February, 1899, entered into a contract in writing with Gardiner, who was the owner of 120 shares of stock of the Empire Dairy Salt Company, in the form of an option, by the terms of which, for the consideration therein expressed, Gardiner agreed as follows:

"To sell, transfer, and convey, at any time within six months from the date hereof, when said party of the second part shall in writing request the party of the first part to do so, to said party of the second part, or to such corporation as said party of the second part shall indicate in said request, which corporation is hereinafter referred to as 'said corporation,' one hundred and twenty shares of the capital stock of the Empire Dairy Salt Company."

The "option" further provided that, in the event that the party of the second part should make the request in writing, as provided, the consideration to be received by the party of the first part for such sale and transfer of said stock should be $6,000 in cash, $6,000 in 7 per cent. preferred stock, and $6,000 in common stock of "said corporation." As a further consideration for such sale, it was provided that:

"At the time of said transfer, if made, there shall be an inventory made of the merchandise and materials on hand at the works of the Empire Dairy Salt Company, and the value thereof determined in the following manner: The salt on hand in warehouse to be computed at the rate of one dollar and forty cents per ton of two thousand pounds, and all coal, cooperage stock, bag stock, and supplies and materials on hand at cost, and all tools on hand at fifty per cent. of their cost. Upon determination of such value, the party of the first part shall receive an amount of seven per cent. preferred stock of said corporation, at par, equal to twelve per cent. of the value of such merchandise and materials on hand. (3) The above specified amount of preferred and common stock and cash shall be delivered to and received by the party of the first part, at the time when the transfer and conveyance above mentioned is made, as full payment and satisfaction for the said one hundred and twenty shares of the capital stock of the Empire Dairy Salt Company, and for his interest in the business, property, and assets of the said Empire Dairy Salt Company. (4) It is further understood and agreed that if such sale, transfer, and conveyance of property is made, then the party of the first part shall, in view of such sale, agree not to engage for a period of five years from the

first day of January, 1899, in the business of manufacturing or selling salt within the states of New York, Ohio and Michigan. (5) * * * It is understood and agreed, however, that if and when such request is made this agreement is thenceforth to be regarded as a contract of sale of the stock described."

March 28, 1899, the defendant sent the following telegram from New York to Gardiner at Toledo, Ohio:

"Ready close deal. Manufacturers propose pay me commission for work done year ago and now. Is it agreeable to you to pay me 10% on what you receive?"

The telegram was followed by a letter from the defendant, dated New York, March 31, 1899, addressed Dr. E. D. Gardiner, Toledo, Ohio, as follows:

"Dear Doc: I inclose you herewith formal notice of acceptance. If you do not wish to come to New York, kindly send me your certificates of stock indorsed in blank, and I will put the trade through for you, and send you the consideration agreed upon. I have no reply from you to my telegram about commission. I did not undertake this work with a view of getting any compensation, but, inasmuch as the manufacturers suggested it, it seemed but proper that I should present the subject to you. I have decided to take 5% instead of 10%, as mentioned in my telegram. If this does not meet with your approval, I should be glad to know it.
                "Yours truly,                              A. S. White, Prest."

The papers inclosed were a printed unsigned request, as follows:

"To E. D. Gardiner, Esq.—Dear Sir: Pursuant to the terms of the certain contract between you and the undersigned, dated February 16, 1899, you are hereby requested to sell, transfer, and convey the property stated, covered by said agreement, to the National Salt Company, incorporated under the laws of the state of New Jersey, and to make delivery of the certificates therefor at the office of Davies, Stone & Auerbach, 32 Nassau street, New York City, on Monday, April 3, 1899, at 10:30 a. m. It is also understood that by making this request the undersigned does not assume any responsibility for the payment of the purchase price, to be paid pursuant to the terms of said agreement, unless and until said good will, plant, patents, trade-marks, and visible and tangible real and personal property are so sold, conveyed, transferred, and assigned, and the conveyance, transfer, and assignment thereof accepted by said National Salt Company, and such responsibility is limited only to the payment of the purchase price specified in said agreement to be paid when and as I receive from said National Salt Company the consideration to be paid by it. Also, that satisfactory service contracts relating to the United States east of the meridian passing through Denver, Colorado, will be entered into by you.
        "New York, March 28th, 1899.
            "Yours. very truly."

The other inclosures were an unsigned printed request for information as to the manner in which Gardiner could receive the consideration, and a blank form of contract, to be entered into by Gardiner with the National Salt Company, the execution of which was to be part of the consideration of the sale of Gardiner's stock to that company.

Upon receipt of defendant's telegram, letter, and papers, Gardiner sent his certificates of stock, as stated, in a letter to the defendant, under date of April 2, 1899, in which Gardiner stated:

"Your telegram regarding 10% commission was awaiting my return from the east. I am now in receipt of a formal notice of acceptance of option, with direction to deliver certificates to you. I send them inclosed—what I

have in Toledo. The balance I have telegraphed Mr. F. J. Humphrey, cashier of the Wyoming County National Bank, to send to Davis, Stone and Auerbach."

—With directions as to the payment of the consideration and in regard to commissions. After stating his reasons therefor, he said:

"I want to do the right thing, and it is needless to say what I thought of 10%, and I don't want to write you what I think of 5%, but I will write you this, that after the deal is closed I will send you $250."

Under date of April 3, 1899, the defendant wrote to Gardiner, acknowledging the receipt of his letter of April 2d and inclosures, stating that he would see that the consideration for the stock was sent as directed, and in regard to commissions said: "I presume whatever action the salt manufacturers take will appeal to you as fair." April 11, 1899, the defendant telegraphed Gardiner at Toledo, as follows:

"Please telegraph S. B. Whitlock, Secretary, care me, New York, that you waive notice of directors' meeting, Empire. This is necessary to conclude deal.                                                                A. S. White."

To this message Gardiner telegraphed the following reply:

"To Mr. S. B. Whitlock: Use your judgment for my interest in Empire. I waive notice of directors' meeting if you think best.     E. D. Gardner."

The directors of the Empire Company at this time were five—Messrs Beardslee, Whitlock, Barnum, Bristol, and Gardiner. On the 13th day of April, 1899, Beardslee, Whitlock, Bristol, and the defendant met at the defendant's office in New York, and proceeded to hold a director's meeting of the Empire Company. At the meeting Beardslee presented the resignation of Barnum as a director, which was accepted, and White was elected in his place; the minutes of the meeting reciting, "he holding five shares of stock, certificate No. 26." White then moved that a dividend of 31½ per cent. be declared, which was carried. The meeting then adjourned.

The defendant's contention is that the special contract of sale, provided the option was closed and consummated within the time allowed, effected an equitable assignment by Gardiner to White of Gardiner's interest in the dividend in question, upon the principle that an agreement to sell stock at a specified price, deliverable and payable in futuro, conveys all dividends between the date of the agreement and date of closing to the purchaser. Currie v. White, 45 N. Y. 822. It may be so assumed, provided White had exercised the option as purchaser. If White had become the owner of the stock by the exercise in his own behalf of the right to purchase, his title would have related back to the date of the option contract. The contract was in the alternative. Gardiner agreed, if the conditions were complied with, to sell upon request to White, or to such corporation as he should indicate. The conditions were that the consideration expressed in the agreement should be delivered to and received by Gardiner at the time when the sale, transfer, and conveyance should be made to the purchaser. The request, unsigned, was not to sell to White, and not upon the terms and conditions of the option. It was expressly stated that White in making the request did not assume any responsibility for the payment of the purchase price until certain conditions therein stated were complied with, not

by Gardiner, but conditions which impliedly were imposed by some other or different agreement than that made by Gardiner and White. Indeed, the request cannot be regarded as made pursuant to their contract, the terms of which contemplated that the payment and delivery were to be simultaneous.   Kelley v. Upton, 5 Duer. 336.   The request was to sell, transfer, and convey the property covered by the agreement to the National Salt Company, and to make delivery of the certificates therefor on April 3, 1899, at the place named; the purchase price not to be paid until "said good will, plant," etc., "are so sold, conveyed, transferred, and assigned, and the conveyance, transfer, and assignment thereof accepted by said National Salt Company."

It is apparent that this unsigned printed paper sent by White to Gardiner as a formal request was a form of request used for the purpose of the transfer of properties of the several companies entering into the combination by which the National Salt Company was formed. It was not in any view of it a request made in pursuance of the agreement made by White with Gardiner, as appears from the context and by the conduct of White in regard to it.   Throughout the transaction White acted as organizer and as an intermediary, without any purpose or intention of acquiring title himself to the property purchased or to be purchased of Gardiner.   He acted merely in the capacity of agent. His telegram, which preceded the sending of the papers to Gardiner, stated that the manufacturers proposed to pay him a commission for work he had done and was doing, i. e., work of forming the combination, for which he suggested a commission to be paid on what was received by Gardiner for his property.   His letter to Gardiner accompanying the papers was that of an intermediary.   He characterized the blank request as a formal notice of acceptance, suggested to Gardiner to send certificates of stock indorsed in blank, stating that he would put the trade through; that he did not undertake the work with a view of getting any commission, but, inasmuch as the manufacturers suggested it, he had decided to take 5 per cent. instead of 10 per cent., as mentioned in his telegram.   Commission for what?   Certainly not upon the purchase price of property bought by him of Gardiner.   If the trade had been put through on the 3d of April, or immediately upon receipt of the certificates, without anything further being done with them, the National Salt Company would have been entitled to the interest in the Empire Company represented by the certificates.   But they were first used by White for the purpose of declaring a dividend upon the stock at a time when the certificates were the property of Gardiner. Upon the pretense that it was necessary to conclude the deal, he telegraphed Gardiner to waive notice of a directors' meeting of the Empire Company, which Gardiner did.   The meeting was held, at which White procured himself to be elected a director, and then with the three other directors present declared the dividened of 31½ per cent.   It was after this that the certificates indorsed in blank were delivered to the National Salt Company, and the consideration therefor paid by it, whereby the certificates became the property of that company.   It was after the sale to the National Salt Company and the certificates had become its property that the blank indorsement was filled in by the direction of White with his name, and the transfers dated back to a day prior to

the directors' meeting, at which the dividend was declared. By what authority does not appear. If White acquired title to the certificates by that transaction, it was after the sale to the National Salt Company, and too late to entitle him to the dividend declared during the ownership of Gardiner.

The judgment should be affirmed.

Judgment and order affirmed, with costs. All concur.