EUGENE LAMB RICHARDS, as Superintendent of Banks of the State of New York, Plaintiff, v. JOSEPH G. ROBIN and Others, Defendants.

THOMAS KELLY and EDMUND L. MOONEY, Appellants; ERASTUS T. TEFFT and Others, Respondents.

First Department December 1, 1916.

Banks — statutory liability of stockholder for debts of insolvent bank — unrestricted sale of stock before insolvency of bank — failure of purchaser to have stock transferred on bank books — when record owner cannot look to purchaser for indemnification — rule where trust relationship exists between seller and buyer.

Where the owners of bank stock sold the same at public auction without restriction or inquiry as to the financial or other qualifications of the bidder, or any other restriction except as to price, and the stock was purchased at public auction by brokers, acting for undisclosed principals, who paid the purchase price, received the stock indorsed in blank and delivered it to their principals, the original owners who remained the record owners on the books of the bank because the purchaser never caused a transfer of the stock to be made, are liable on the subsequent failure of the bank for the statutory liability of stockholders under sections 71 and 72 of the Banking Law. And being charged with a judgment for their statutory liabilities are not entitled to indemnification from the brokers who purchased the stock for the undisclosed principals.

As there was no relationship between the vendors of the stock and the purchaser thereof, save that of seller and purchaser, and as the sellers did

not rely upon the credit of the buyer, and were indifferent as to the identity of the transferee to whom they delivered the certificates indorsed in blank, there was no duty resting on the purchaser to cause the transfer to be made on the books of the bank to their principals for whom the purchases were made.

*It seems*, that in order to charge the purchaser of such stock with the duty of indemnifying the record owner when charged with the statutory liability, there must be a trust relation between the nominal and registered owner and the actual owner or purchaser, whereby the nominal owner is trustee and the actual owner *cestui que trust* as to all dividends or increments on the stock, the actual owner in return being entitled to the profits in the stock so to be bound to indemnify the nominal owner against any call or assessment thereon. Moreover, *it seems*, that this trust relationship exists as to each actual owner of the stock only so long as he remains the owner, and when he parts with the stock to a succeeding purchaser so as to be no longer entitled to the profits thereon, he is no longer bound to indemnify the record owner against calls.

*It seems*, that it is as much the right and duty of the transferrer of shares of stock to procure transfer to be made upon the books of the corporation as it is that of the transferee.

Cases collated analyzed, per DOWLING, J.

APPEAL by Thomas Kelly and another from so much of a judgment of the Supreme Court in favor of the respondents, entered in the office of the clerk of the county of New York on the 24th day of June, 1915, as dismisses the complaint as to the respondents, dismisses the cross demand of the appellants against them and denies exoneration to the appellants from the relief granted against them in favor of the plaintiff.

The judgment was entered upon the decision of the court after a trial at the New York Special Term.

*Edmund L. Mooney* [*Gilbert D. Lamb* and *Charles T. B. Rowe* with him on the brief], for the appellants.

*Edward E. McCall* [*Edward B. Boise* with him on the brief], for the respondents.

DOWLING, J.:

This action was brought to enforce the statutory liability of stockholders of the Northern Bank of New York under sections 71 and 72 of the Banking Law (Consol. Laws, chap. 2; Laws of 1909, chap. 10). Judgment was rendered against various defendants including the appellant Kelly in the sum of $1,500 and the appellant Mooney in the sum of $1,100, the par value of stock

standing in their respective names on the books of the bank. Appellants were denied cross relief against the respondents exonerating the former from this liability. The facts as found by the trial court are as follows: On March 9, 1910, Edmund L. Mooney, then being the owner of eleven shares of the capital stock of the Northern Bank of New York (represented by two certificates), caused the same to be offered for sale by Adrian H. Muller & Son, auctioneers, at public auction at the Exchange Sales Rooms, 14–16 Vesey street in the city of New York. The sale was for cash and without restriction or inquiry as to the financial or other qualifications of the bidder, or any other restriction, except as to price. Under the terms of sale ten per cent was to be paid on the date of sale and the balance before one o'clock of the next day to the auctioneers at their office, and the owners reserved the right to bid at the sale; no checks were to be received in payment unless certified and approved. The respondents were doing business as brokers under the style of Tefft & Co. and were members of the New York Stock Exchange. Pursuant to instructions received by them from one James T. Wood they attended said sale by their cashier, Frank A. Bross, and as brokers for Wood bid for said eleven shares of bank stock, which were knocked down to them at par. Mooney did not rely upon the credit or responsibility of Tefft & Co., who on March 10, 1910, paid the auctioneers $1,100, being par for the eleven shares of stock of $100 each and received in exchange from the auctioneers two certificates aggregating eleven shares of stock, each dated October 19, 1908, each issued and standing in the name of Edmund L. Mooney and each indorsed by him in blank. The form of the indorsement was as follows:

"For value received ——— hereby sell, assign and transfer unto ——— ——— Shares of the Capital Stock represented by the within certificate and do hereby irrevocably constitute and appoint ——— attorney to transfer the said stock on the books of the within named Bank with full power of substitution in the premises.

"Dated *Oct.* 20, 1908.        EDMUND L. MOONEY.
" In Presence of:

"DANIEL J. O'DRISCOLL."

Tefft & Co. accepted the certificates of stock so indorsed and on the same day, March tenth, delivered them to James T. Wood, who paid them a commission of $1.38 upon the bidding in of the stock. Tefft & Co. in the transaction acted only as brokers for Wood and on his account and not for their own account, and the certificates of stock have never been in the possession of the firm since March 10, 1910. One of these certificates subsequently came into the possession of the Carnegie Trust Company as part collateral for a loan made by it to Joseph G. Robin, and it was still so held when the Superintendent of Banks took possession of its assets. On March 16, 1910, Thomas Kelly offered for sale through Adrian H. Muller & Son, auctioneers, fifteen shares of the capital stock of the Northern Bank of New York under terms of sale identical with those in the Mooney sale. Here, also, the sale was for cash, and without restriction or inquiry as to the financial or other qualifications of the bidder, or any other restrictions, except as to price. Again Tefft & Co., pursuant to instructions from James T. Wood, attended the sale by their cashier, Bross, and as brokers for Wood bid in the fifteen shares at par. The vendor did not rely on the credit or responsibility of Tefft & Co., who on the following day, March seventeenth, paid the auctioneers $1,500, being $100 per share for the fifteen shares sold, and received from the auctioneers in exchange two certificates of stock in said bank, aggregating fifteen shares, each of said certificates being issued and standing in the name of Thomas Kelly, and by him indorsed in blank. The form of indorsement was as follows:

"For value received —— hereby sell, assign and transfer to —— —— shares of the capital stock represented by the within certificate, and do hereby irrevocably constitute and appoint —— attorney to transfer the said stock on the books of the within named Bank with full power of substitution in the premises.

"Dated, *December 14th*, 1909.        THOMAS KELLY,
"In the presence of:
      "JOHN A. O'DONOHUE.    Signature Guaranteed,
                      "PRINCE & WHITLEY."

Tefft & Co. accepted the certificates so indorsed and March 17, 1910, delivered them to James T. Wood, who reimbursed them for their outlay of $1,500 and paid them a commission of $1.88 upon their bidding in of said shares for his account. Tefft & Co. in the transaction acted only as brokers for Wood and for his account and not for their own account, and since March 17, 1910, these two certificates aggregating 15 shares of stock have never been in their possession. Thereafter one of the certificates came into the possession of the Carnegie Trust Company as part collateral for a loan made by it to Joseph G. Robin, and it was still so held when the Superintendent of Banks took charge of its assets. As to both these transactions (in relation to the Mooney and Kelly stock) Tefft & Co. did not, at or prior to the delivery of the stock, disclose to the sellers or any one acting on their behalf that they were acting for any one other than themselves, nor did they cause any of the certificates to be transferred on the books of the bank from the name of Mooney or Kelly to any other person At the time of these auction sales there had been no default on the part of the Northern Bank of New York in the payment of any debt or obligation. During all these times the Northern Bank had a stock transfer office in the borough of Manhattan, city of New York, and the Columbia Trust Company, register of its stock, also had an office in said borough. The certificates of stock were still in the names of Mooney and Kelly on the books of the bank (having passed out of the possession of Mooney and Kelly on March tenth and sixteenth, respectively, and out of the possession of Tefft & Co. into that of Wood on March eleventh and seventeenth) when, on December 27, 1910, the Northern Bank being insolvent, the Superintendent of Banks took possession of its property and business under the Banking Law (§ 19, as amd. by Laws of 1910, chap. 452) and proceeded to liquidate its affairs, at which time its debts and other contractual liabilities exceeded its assets by more than the amount of its capital stock then outstanding. The Superintendent of Banks thereafter determined to enforce the stockholders' liability to the extent of $100 per share, and by the judgment herein Mooney and Kelly as stockholders still of record at the time of the insolvency have been held liable

for $1,100 and $1,500, respectively, on their respective recorded holdings of 11 and 15 shares. Appellants ask for relief over against Tefft & Co. on the ground that when the sale to the latter was consummated and the certificates delivered to them, Tefft & Co., since they did not disclose their principal, became as to appellants the purchasers of the stock regardless of whether or not it was transferred on the books of the corporation, and were liable to all the obligations of a purchaser. Appellants contend as well that it was the duty of Tefft & Co. to have the legal transfer on the bank's books made to relieve appellants from liability as stockholders, and that from the mere fact of the sale and transfer the law implied a duty or obligation on the part of Tefft & Co. to appellants to see that the burdens and liabilities attached to or growing out of the stock should not come upon appellants, and that regardless of transfer on the books; or, stated differently, that Tefft & Co., by their failure to cause a transfer on the bank's books, continued liable to indemnify appellants for all calls the latter were compelled to pay during the time appellants' names remained on the books of the bank as the nominal owners.

We cannot agree with this contention of appellants. It is to be noted that there was no relationship between appellants and Tefft & Co. save that of seller and purchaser of stock by the medium of a public auction, Tefft & Co. being the agents of the real buyer. Appellants did not rely upon the credit of the buyer. It was immaterial to them who bought their stock, for they were to be paid in full in cash, and they were indifferent as to the identity of the transferee, for they delivered their certificates indorsed in blank. They were unable to establish any duty resting on Tefft & Co. to cause the transfer on the books to be made to their principal, Wood. The theory on which the actual owner of stock has been held liable to the nominal owner to indemnify him against charges against the stock is the natural consequence of that on which the nominal owner has been held liable to the actual owner for dividends declared upon the stock. Both proceed upon the theory of an implied trust and the extent and duration of both are applicable only to the period of actual ownership of each successive actual owner. The liability is not contractual, but is one of trust.

*Johnson* v. *Underhill* (52 N. Y. 203) was an action brought by a stockholder of record for reimbursement from the estate of the actual owner of sums he had been obliged to pay as a stockholder. Plaintiff had delivered the stock to the purchaser indorsed in blank, and no transfer on the books had been made. After discussing certain English cases the court said (p. 212): " Without seeking to determine how much or how little, the decision of those cases was made to depend upon the presence of those provisions in the instruments by which the defendants became related to the plaintiffs, this is plain, and is noticed in the decisions, that in those instruments there was no express contract by the defendant to become liable to the plaintiffs. The duty or obligation or promise of the defendants to save the plaintiff from liability was held to be implied by the law from the transaction; and such must be the result even in the absence of any such provision. The vendee does, in all cases of sale and transfer to him, take the shares with a right to all the benefits attached to or growing out of them; and this from the mere fact of the sale and transfer. And so, from the same fact, he takes them subject to all the burdens and liabilities attached to or growing out of them. And so the law will imply a duty, obligation or promise from him to the vendor, that those burdens and liabilities shall not come upon the latter." And (p. 214) further: " This court has held that a vendor of shares of stock by an executory contract becomes, while it is unperformed, a trustee *sub modo* for the vendee, and that the dividends received were held by him as trustee for his vendee, and that his vendee was entitled to new shares offered to the holders of the old. (*Currie* v. *White*, 45 N. Y. 822.) And as a counter proposition the same case holds that the vendor was not bound to advance his own money, to save for his vendee the new shares, which were to be awarded only upon a further payment by the holders of the old.

" This is upon the principle that the duty to bear burdens is correlative to the right to take benefits.

" And it is from the existence of that duty, that the law will imply the undertaking, upon the part of the vendee, to indemnify the vendor against future liabilities."

In *Locke* v. *F. L. & T. Co.* (140 N. Y. 135) the court said

(p. 142): "He held the legal title to the stock, but necessarily held it, from the date of his declaration, as trustee for the beneficiaries. There was no formal transfer on the books of the company from himself as an individual to himself as trustee, and he remained the nominal owner, holding the naked and barren legal title. In such a case, as between a vendor and vendee of stocks, the vendor holds the legal title as trustee for the vendee, because the former, having parted with the entire beneficial interest, can hold the legal title in no other way. (*Johnson* v. *Underhill*, 52 N. Y. 203.)"

The English cases which have established this doctrine of an implied trust relationship between the nominal and actual owners of stock are preceded by *Burnett* v. *Lynch* (5 B. & C. [K. B.] 589). In that case Sir Robert Burnett had been granted a lease, whereby he had covenanted to pay rent and perform other covenants. His executors assigned the lease to Lynch, and by the terms of the assignment the latter was to hold subject to the payment of rent and the performance of all the covenants; he entered into no express covenant or contract that he would pay the rent and perform the covenants. After continuing in possession of the premises until a few days before the expiration of the term, Lynch reassigned the lease to a third party. It was held that while an action of covenant was not maintainable, an action in assumpsit would lie, because Lynch, by taking the estate subject to the payment of rent and the performance of the covenants, made it his duty to pay the rent and perform the covenants, and as by neglecting his duty a burden was cast on the person from whom he took the estate, the law would imply a promise as arising out of that duty. Lynch was, therefore, held liable for the failure to perform the covenants of the lease *during the time he continued assignee*, whereby Burnett's executors sustained damage.

In *Humble* v. *Langston* (7 M. & W. 517) the Court of Exchequer passed on the question whether the stockholder of record's right to indemnity arises from the terms of the contract of purchase and sale or from the equitable relationship existing between the stockholder of record and the actual owner of the stock. The plaintiff, a stockholder in the Bristol and Exeter Railway Company, made a contract with the

defendant, through their respective brokers, for the sale and purchase of thirty shares of the stock of that company. An assignment in blank was delivered by the plaintiff to the defendant but the certificates were not transferred by the defendant upon the books of the company. There were subsequent calls upon the plaintiff as stockholder of record and he brought an action of assumpsit against the defendant for his failure and refusal to indemnify the plaintiff against such calls. The court held that no obligation to indemnify the seller of the stock could be implied from the terms of the contract of sale, and that no special contract by the purchaser to indemnify the seller was proved. The stockholder of record's right to indemnity arose not out of the contract of sale but from the fact that, after the delivery of a blank assignment, he was a trustee for the actual owner of the stock. As the declaration was in assumpsit the court held that the action would not lie and a nonsuit was directed to be entered.

Baron PARKE says (p. 529): "But in this case, the plaintiff did not pursue the course which, according to law, he ought to have done [*i. e.*, transfer the stock on the books of the corporation]. The defendant appears to have been satisfied with the title, and both the plaintiff and he to have been content, the one to deliver, and the other to accept, a transfer with the name of the vendee in blank; for the purpose, no doubt, of the defendant selling and transferring those shares to another, and filling in the name of some subsequent purchaser from himself; or, more probably, of handing over the instrument to some purchaser from himself, on receiving the price; for the shares were clearly bought on speculation. On this occasion, when this, probably the customary course, was adopted, instead of that which the law, in the absence of custom, prescribes, the plaintiff might have insisted that he would not deliver such a blank conveyance as was asked, which might postpone indefinitely the actual conveyance to a vendee, unless the defendant would indemnify him against all intermediate calls; and if that had been done, the plaintiff would have been safe; but this he omitted, and there is no trace of any evidence of such a contract having been made or contemplated. The truth probably is, that the plaintiff did not think of this future

liability at all, or if he did, he thought that the shares would be sold, after a new call, to a purchaser who would take the amount into consideration in fixing the price, and pay the calls to the Company in order to get the transfer completed."

The court distinguished *Burnett* v. *Lynch* (*supra*) on the ground that the assignee of a lease is not only liable for the performance of all covenants running with the land, but the lessee was also liable as a surety as between himself and the assignee for the performance of the same covenants during the continuance of his interest as assignee; "the consequence is, that a duty is imposed on the assignee at common law to perform the covenants during that time, for which an action on the case will lie. But here the defendant contracts no liability at all with the Company, so that the plaintiff is not a surety for him, and if there were any analogy between the two cases, the defendant's implied promise would only be to indemnify against such calls as should be made *whilst he should be beneficially interested,* so that the promise in the declaration, which is to indemnify against *all* future calls, is too large, and no amendment could make it good, *as none of the calls,* the subject of this action, *seems to have been made until after the defendant himself had parted with the shares.*" (Pp. 530, 531.) In *Walker* v. *Bartlett* (18 C. B. 845; 86 Eng. C. L. 844) plaintiff was the owner of 500 shares in a cost-book mine, according to the rules of which the person registered in the cost book as owner was subject to the payment of calls in respect of the shares as long as he continued registered as the owner. He sold his shares to defendant and delivered to him a document addressed to the secretary of the mine, by which he requested the secretary to enter a transfer of the shares from his name to that of the transferee, but left the name of the transferee blank, to be filled in by the holder of the document. At the bottom of the blank was an agreement in blank to be signed by the transferee. Defendant did not cause the shares to be registered in his name, and plaintiff in consequence of his name being continued in the cost book as the owner, was compelled to pay some subsequent calls. The Exchequer Chamber

held that there was no legal obligation on the defendant to cause the shares to be registered in his name as the owner, but there was an implied obligation on him to indemnify the plaintiff against calls made during the time when defendant was *virtually and potentially the owner of the shares.* WIGHTMAN, J., said (p. 860): "With respect to the first point we think that there was no obligation on the part of the defendant to cause the shares to be registered in his name as owner. The form of the document, in which the name of the proposed transferee was in blank, shows that it was perfectly understood between the parties to the contract that the defendant should not be bound, unless he liked it, to register the shares in his own name, but that he might transfer to some other person the same right that he had." Liability was held to attach to defendant, however, upon the ground that as he took the shares subject to the same rules as plaintiff, which was that the registered owner would pay the calls, there was an implied promise that he would save plaintiff harmless for any calls made during the time he was *virtually owner of the stock.* The court called attention to *Humble* v. *Langston* (*supra*) and distinguished it from the case at bar in that in the *Humble* case plaintiff was claiming an indemnity against calls made after defendant had parted with his interest.

In *Castellan* v. *Hobson* (L. R. 10 Eq. Cas. 47) plaintiff, owning certain shares in the Imperial Mercantile Credit Association, contracted to sell them to a jobber, from whom defendant contracted to buy them, through his broker. Hobson's broker gave the name of the person to whom the transfer was to be made as Banks. A transfer was executed by plaintiff to Banks, but never was completed by registration with the company, either because of the state of the latter or the neglect of the transferee. Plaintiff remained the legal owner of the shares and became legally liable to calls in respect thereto. Having paid the amount of the calls, he sued Hobson and Banks for indemnification. Sir W. M. JAMES, V. C., said: "But the real answer is, that it is not a question of vendor and purchaser, it is not a question of specific performance at all; it is a question of trustee and *cestui que trust.* The result of the transactions is that Castellan remains

the legal owner of the shares without any beneficial interest in them. As legal owner he has remained exposed to liabilities and he is entitled to indemnity from the real equitable owner of the shares, for whom he was trustee. For whom, then, is he trustee? He is trustee for Hobson and not for Banks. * * * Castellan, therefore, being the legal owner, and Hobson being the beneficial owner, and Banks being a mere name interposed between the two, Hobson, the real beneficial owner, the *cestui que trust* for whom Castellan is trustee, is bound to indemnify him against the calls which have been made."

In *James* v. *May* (L. R. 6 Eng. & I. App. 328) May consented to become the nominal purchaser of 4,978 shares in a company at the request of the Contract Company, Limited, for a consideration of £15. He executed a transfer of the shares to the latter company when he received them. Thereafter as the registered owner of the shares he was subjected to a claim of over £30,000 for calls based on his record ownership. He sought and obtained indemnity from the Contract Company, Limited, the actual owner. Lord CHELMSFORD held (p. 333) that he was a trustee for the Contract Company in respect of these shares; that it was "the ordinary case of a trustee being indemnified by his *cestui que trust*," and in this Lord CAIRNS agreed (p. 334).

*Kellock* v. *Enthoven* (L. R. 8 Q. B. 458; affd., L. R. 9 Q. B. 241) does not disturb the principle of the foregoing cases but was decided because of the provisions of "The Companies Act, 1862" (25 & 26 Vict. chap. 89, § 38) whereby a stockholder's liability was imposed on those who had held stock within a year preceding the commencement of the winding up of the company.

The case most resembling the one at bar is *Rogers* v. *Toland* (43 Penn. Super. Ct. 248). There plaintiff was the registered owner of 100 shares of the capital stock of the American Alkali Company. He had paid in ten per cent of the subscription and received a stock certificate in his own name evidencing his ownership *pro tanto*. Through his brokers he sold the shares to defendants, also brokers, on June 5, 1899, receiving the consideration in cash and turning over to them the certificate indorsed in blank. On the following day defendants sold the shares to another firm, turning over the certificate exactly as it

was received by them.    Thereafter defendants had no interest whatever in the stock.    In 1901 a call of ten dollars per share on the stock was made by the corporation.    Several years thereafter it became insolvent and a further assessment of two dollars and fifty cents per share was levied.    Plaintiff was judicially held liable for these calls and after paying them sued defendant for the money he was thus compelled to pay over.    The court said (p. 260): "Let us turn then to the situation of the parties at the time of the transaction in suit.    The plaintiff, as we have said, was the registered owner of the shares.    They were freely alienable.    When he came to sell them he could have insisted if he chose that his vendee must take his place as registered owner.    He had within his own control the means to effectuate that intention if he entertained it.    Or he might sell his shares and turn over the evidence of ownership by a blank indorsement so that his vendee could in turn readily dispose of them.    This he elected to do.    *    *    * The purchase price he demanded for his stock was but $250, and this the purchaser paid.    It would seem to us to be unreasonable to hold that, as an incident to this transaction, the purchaser was bound to assume a possible responsibility that might require him to pay the further sum of $4,500.    We may grant the soundness of the proposition that where one takes over property, the ownership of which may bring with it profit or loss, the right to receive the profits creates the correlative liability to pay losses, but both right and obligation, in this view of the case, are co-extensive.    *As long as the defendants were the real owners* of the stock and entitled to receive any dividends upon it, it would be inequitable to say that they were not liable for assessments made necessary during their ownership.    But years before the assessment in this case was made the defendants, in the exercise of their right, had sold the stock, and the right to receive its profits, with the correlative obligation to discharge any assessments, had passed on in the channel of commerce into which this certificate was launched by the blank indorsement of the plaintiff.

"It is agreed that after the defendants parted with their stock they were under no obligation to the company which

the latter could enforce. The payment, therefore, of the assessment by the plaintiff was in no way in relief of these defendants, nor was it for the improvement of their property. The contract of indemnity sought to be fastened upon them was in no way a necessary incident of the main purpose of the transaction which was to transfer the ownership of the shares from the plaintiff to the defendants. The former, either because he was the original subscriber, or because he permitted his name to remain on the books of the company as registered owner, incurred a liability with which he was not obliged to incumber his stock. He may have chosen to take the risk of his possible liability becoming an actuality, and may have preferred to sell his stock for the best price he could get without regard to the future. In a word, the transfer of this possible liability was no necessary part of the sale of his stock unless he chose to make it so. So far as the record shows, he did not so elect, and we are unable to find any satisfactory ground upon which to predicate the conclusion that every man who purchases a share of stock impliedly agrees with his vendor, not only that he will discharge the burdens imposed upon that stock while he owns it, but all other burdens that may thereafter come, owing to the default or negligence of those who, years afterwards, may succeed him in that ownership."

This is a well-considered case and the opinion of Judge HEAD, who wrote for the court, is very persuasive.

While the English cases are not in entire accord, many of them cited by appellants being decided because of the rules of the London Stock Exchange and inapplicable to conditions in this country, the weight of authority here and abroad seems to be with the rule that the relation between the nominal or registered, and the actual owner of stock which has been sold with the transfer indorsed thereon blank, is one solely of trust, implied by law, whereby the nominal owner is trustee and the actual owner *cestui que trust*, as to all dividends or increment on the stock, and the actual owner in return, being entitled to the profits from the stock, is bound to indemnify the nominal owner against any calls or assessments upon the stock. But this trust relationship applies to each actual owner of the stock

only so long as he remains such owner, and when he parts with the stock to a succeeding purchaser, as he is no longer entitled to the profits on the stock, so he is no longer bound to indemnify the record owner against calls.

The weight of authority, as well, is in favor of the proposition that the purchaser of certificates of stock indorsed for transfer in blank owes no special duty to the vendor to see that it is registered in his name or that of his subsequent vendee.

The seller has made the situation possible by his delivery of the stock indorsed in blank and can cast no additional burden upon the buyer by so doing. It is as much the right and duty of the transferrer of shares of stock to procure the proper transfer to be made upon the books of the corporation as it is of the transferee. (*Webster* v. *Upton*, 91 U. S. 65; *Johnston* v. *Laflin*, 103 id. 800; *Lockwood* v. *U. S. Steel Corporation*, 153 App. Div. 655; revd., on other grounds, 209 N. Y. 375.)

The judgment, in so far as it is appealed from, should be affirmed, with costs to respondents against appellants.

CLARKE, P. J., LAUGHLIN, SCOTT and PAGE, JJ., concurred.

Judgment affirmed, with costs to respondents against appellants.