In the Matter of the Estate of HAROLD STREBEIGH, Deceased.

Surrogate's Court, New York County, March 20, 1941.

382

*Bouvier & Beale* [*C. S. Huffman, Jr.,* of counsel], for the adminis-trator *c. t. a.* and the executor of the deceased executrix.

*Carter, Ledyard & Milburn* [*Leslie D. Dawson* and *H. H. Hormel, Jr.,* of counsel], for Blanche S. Carnegie, objectant.

*Walton Clark, Jr.,* for Barbara Strebeigh, objectant.

*Reeves, Todd, Ely & Beaty* [*Harry J. Ahlheim* of counsel], for Robert L. Strebeigh, individually and as trustee.

*Alfred Norick,* for Frank Lawrence.

*Neilson Olcott,* for Blanche Bonaparte.

DELEHANTY, S. The will of deceased was probated on a petition alleging him to be a non-resident of this State. Tax proceedings were had on the same basis. However, the question of domicile was never formally litigated until the present proceedings were instituted for judicial settlement of the accounts of the adminis-trator *c. t. a.* and of the executor of the deceased executrix. Deceased's domicile of origin was New York city. Here he acquired substantial property and here he continued in active business until about 1920. Meantime he twice married. Although the record is not explicit on this point, it is inferentially established that both marriages took place in New York State. The matri-

monial *res* in each instance was in New York. The first marriage terminated in divorce; the second continued until deceased's death in December, 1935. About 1910 a house at Hewlett, L. I., was purchased either in deceased's name or that of his wife. Here he lived for a year or two. Thereafter this house was rented apparently. It was sold in 1923. After leaving Hewlett deceased lived either in an apartment in New York county or in a rented house at Easthampton, L. I. Sometime between 1917 and 1920 he adopted the practice of spending his winters in Nassau, Bahama Islands. He suffered from catarrh and reasons of health seem to have actuated him originally in this practice. In other seasons of the years in which he made these winter visits he lived in New York city or spent his time in traveling. In 1928 he made his will. In this he stated that his residence was in New York county.

In 1930 a plot of land was bought at Nassau in the name of Grace L. Strebeigh (deceased's second wife) and on it a house was built at a cost of about $28,000. This property was owned by her continuously to the time of deceased's death. From and after 1931 deceased filed non-resident New York State income tax reports. To the State Tax Commission he gave his residence as Nassau, Bahama Islands. During the same period, in his Federal income tax returns he gave his address as 1 West Fifty-fourth street, the location of a club in which he had a non-resident membership at the time of his death. Deceased's body was interred at Nassau. He is quoted by his attorney as saying (in 1932 probably) that he regarded Nassau as his permanent home. On the other hand, he never spoke with finality on that subject to his daughter who testified in this proceeding. Deceased kept his banking connections in New York until the time of his death. His income was derived principally from real property situated in New York county. His fundamental business interests and some fraction of his social life seem always to have been rooted in New York. On the other hand, in the latest years of his life he was more often physically present at Nassau than in this city. At Nassau (where, toward the close of his life, he was spending eight months in every year) his daily life followed a rather fixed routine. Each day he regularly went from his house to a club, thence to a hotel and finally back home and to bed. He apparently had the social life of a retired business man enjoying a genial winter climate which was less trying on his catarrhal condition than the harsher northern winters.

Deceased's domicile must be decided under New York law. The suggestion of one litigant that English law should be applied in deciding this question is rejected. Each case involving the

issue of domicile. is largely dependent on its own facts. The question here is whether Harold Strebeigh took his home out of New York and established. it in Nassau intending thereby to make Nassau his permanent abode. It appears clearly that between 1928 (when concededly he was domiciled in New York) and 1935 (when he died) he never squarely confronted the question of a change of domicile. Had he done this and had he explicitly decided upon a change thereof it is unlikely that he would have remained silent about it in course of his voluminous correspondence with his nephew-managing-agent and his lawyer, with both of whom he was on intimate terms. Likewise, if he had made any decision to change his domicile he might have been expected to have made suitable alterations in his outstanding will and to have avoided reporting a New York residence up to the time of his death to the Federal income tax authorities. For at least fifteen and possibly for eighteen years before his death the deceased had wintered in Nassau. For all but seven of these years he was concededly domiciled here. Only after 1930 did he by piecemeal operations and for limited purposes sever even partially the ties attaching him to New York.

The rules of law applicable to the foregoing facts have been formulated by *Matter of Trowbridge* (266 N. Y. 283). There as here no dispute existed as to the evidentiary facts. The facts there as here pointed in two directions. The court said (p. 289): " What must be here decided is whether all the facts tending to show that his domicile was then (at the time of his death) in Connecticut conclusively overbalance all the facts tending to show that he was at that time domiciled in this State. In its nature such an analysis of the evidence is a comparison of one combination of facts with another, and the significance of some of the factors involved is as matter of law greater than that of others." In the present case the conceded domicile of origin in New York certainly continued until 1930. Thereafter · the property of deçeased, his business interests, his club membership and his citizenship (at least his Federal citizenship) continued here until his death. The burden of proving that the New York domicile was changed to Nassau " rests upon the person who alleges a change." (*Matter of Newcomb*, 192 N. Y. 238, 250.) To sustain that burden in this case those who urge that a change of domicile occurred must show a perfectly clear case since " less evidence is required to establish a change of domicile from one state to another than from one nation to another." (*Matter of Newcomb, supra.*) The proof must show, as the *Newcomb* case has held, that the intention to acquire a new domicile must be " absolute and fixed " and that the

acts of the person affected " confirm the intention." Where, as here, a person leaves his own country to spend the winter season for reasons of health in a foreign land it has been observed by Beale that " the ties of country, of manners and of language [are] so strong that one could with difficulty break them altogether and there must therefore be a stong presumption against the change of domicile in such a case." (1 Beale, Conflicts of Laws, § 22.3.) " The fact that a person [like deceased here] has expressed a desire * * * to be buried in a certain place has very slight significance in determining whether or not that place was his domicile." (Kennan on Residence and Domicile, § 48, p. 101. Cf. *U. S. Trust Co.* v. *Hart*, 150 App. Div. 413; modfd., 208 N. Y. 617.) The mere circumstance that a substantial house at Nassau was built on land owned by deceased's wife is not of decisive importance. (*Matter of Martin*, 173 App. Div. 1; appeal dismissed, 219 N. Y. 557; Kennan on Residence and Domicile, opinion cited, p. 148.) In the present case the heavy burden of showing a change of domicile from this State to a foreign nation " is not sustained by showing a period of winter residence there in obedience to the demands of health, in the absence there of the activities associated with decedent's chief interests and of the objects of those interests." (*Texas* v. *Florida*, 306 U. S. 398, 427; 83 L. Ed. 817, 836.) There is in this case neither proof of an absolute and fixed intention to acquire a new domicile nor acts unequivocally indicating such intention. That deceased for income tax purposes declared himself a resident of Nassau is of no real moment. In *Texas* v. *Florida* (*supra*) the deceased whose domicile was there in controversy had acted in a similar way. The court said that (p. 417) " if declarations were alone sufficient to establish domicile, the record would leave no doubt that Green was domiciled in Texas until the time of his death. But in this connection it should be noted that Green never paid an income tax or a personal property tax on intangibles in any State * * * " and the court concluded that declarations of this kind made for tax purposes were of trivial importance. The same view was taken of declarations in the *Trowbridge* case. Deceased there not only declared his residence to be in New York for tax purposes but he also voted in New York and declared in his will that he was a resident of New York. His " pre-eminent headquarters," however, were found by the Court of Appeals to have been in Connecticut and that was decisive of the controversy. So in the present case the court finds on the facts that the pre-eminent headquarters of deceased never shifted from New York and hence that at the time of his death he was domiciled here.

The conclusion reached as to deceased's domicile disposes of those objections which assert that since deceased was domiciled in Nassau the law of that place puts the whole burden of estate taxes on the residuary estate. Actual domicile being in New York, it follows that the estate taxes must be apportioned pursuant to section 124 of the Decedent Estate Law, except that one beneficiary (now to be mentioned) need not contribute. One of the provisions of deceased's will directed payment to deceased's first wife (Blanche Bonaparte) out of a trust created by deceased of an annual sum which deceased in his lifetime had bound himself to pay her. In a proceeding to construe deceased's will it was decreed " that the annuity provision made in decedent's will for Blanche Bonaparte be, and the same hereby is held to be in discharge of a valid claim and charge against the decedent's estate * * *." As a *creditor* of deceased, Blanche Bonaparte is entitled to have her money net. Her status is not that of a gratuitous annuitant who receives a benefit within the meaning of *Matter of Tracy* (179 N. Y. 501). She is subject to no tax contribution because the payments to her are made pursuant to deceased's plan to discharge his debt to her by means of an equitable charge against a trust *res*.

With this exception contribution is the standard. That fact requires some reference to factors arising out of the delay of deceased's widow in administering his estate and factors deriving from the plan of her will. The discussion which follows disposes in principle of a number of objections in respect of which later specific rulings are made. Deceased's widow during her lifetime was entitled to the net income of the trust out of which payment had to be made first to deceased's first wife. The widow also was deceased's residuary legatee and residuary devisee and was sole executrix of his will. She qualified as executrix on February 26, 1936, but died on April 12, 1937, without completing the estate administration. Meantime, in November, 1936, she made a will by which she gave to her sister, Cora Bogue, such securities as stood in the widow's own name. Her will then provided that " all securities not standing in my name at the time of my death but in which I have any interest or over which I may have a power of appointment " should belong to her stepdaughter, Barbara. The only securities not standing in the widow's name in 1936 when her will was made and in 1937 when she died, in respect of which *a claim* could be made of " any interest " on the part of the widow, were securities originally owned by her deceased husband. The stepdaughter-beneficiary asserts by her objections that all securities in this estate were beneficially owned by the widow at least from and after the date of execution by the latter of her 1936 will; and

so claims all deceased's securities on the theory that in law they were owned by his widow when her will became operative. The 1936 will of the widow also specifically devised to her nephew one parcel of realty, specifically devised in trust her real property situated in Nassau and devised the remainder of her real estate to her two stepdaughters in equal shares.

The proof shows that the widow of deceased never actually made a physical delivery from the estate of deceased to herself as legatee of the securities now claimed by Barbara Strebeigh. The securities of the Harold Strebeigh estate were never earmarked for her own individual account by any physical or symbolical action of the widow-executrix. The making of the 1936 will did not constitute a constructive delivery of the securities. The text of her will permits an inference that the widow expected to own at the time of her death some or all of the securities originally owned by her husband and intended to provide for the possibility that at her death these securities might be standing untransferred from his name. On the other hand, the text of her will is also consistent with the possibility that at the time of her death no securities at all or only securities unconnected in any way with the husband's estate would answer the description in her will. The court cannot spell out of this state of fact any constructive delivery such as the objectant now asserts to have occurred. The claim of constructive delivery because of the use of general language in an ambulatory instrument — her will — is found by the court to be unsound and it is accordingly wholly rejected.

The failure of deceased's widow-executrix to pay the estate taxes due from his estate coupled with her own testamentary scheme present a problem for which neither the research of counsel nor that of the court has found a counterpart. Deceased's assets consisted of cash, securities and realty. The toll exacted by way of estate taxes (see discussion and authorities cited in *Matter of Harjes*, 170 Misc. 431) is secured by every asset taxable at deceased's death. Hence deceased's cash, his securities and his realty were all subject to the toll and each and all of them stood as security for payment of the toll. When, therefore, the deceased executrix failed in her will to indicate any wish respecting the source of payment of the estate taxes due on deceased's property and when in addition (though leaving the toll unpaid) she undertook to parcel out to various of *her* beneficiaries selected parts of the property rights devolving upon her under deceased's will, she must be held to have intended that each element of property value originally possessed by deceased and passing to *her* beneficiaries should contribute ratably to the discharge of the estate tax lien

existing thereon so long as the estate tax on deceased's property remained unpaid. That rule accords with equity and with the command of section 124 of Decedent Estate Law. (*Matter of Rappaport*, 167 Misc. 164; *Matter of Stanfield*, 170 id. 447; affd., 257 App. Div. 932; motion for leave to appeal denied, 281 N. Y. 887.) The tax question being thus disposed of some other general rulings may be made.

While acting as executrix of deceased the widow assumed management of the trust *res* pending qualification by the trustee to administer the trust. She had a substantial interest in this trust as income beneficiary. Before her death she collected more than $9,000 in trust income. After allowing for payment of the equitable charge in favor of the first wife, the widow's income share therein amounted to more than $4,000. She did not earmark this money in any way. She did not transfer it to her own account but left it in the estate account. It is argued by some objectants that thereby she gave this income to the estate. There is no evidence whatever in the record to support this alleged gift. The court holds as a matter of law that the net balance of trust income to the date of her death belonged to the widow.

The widow-executrix also paid from her own resources certain items aggregating $4,535.58 in respect of which the accountant applies for reimbursement to her estate. Some of the objectants assert that by making these payments the widow contributed them to her husband's estate. The proof shows that with her own money the widow paid deceased's creditors the sums due them, a total of $1,912.99. She took no assignments from them. That is not enough to warrant a holding that the widow intended to assume her husband's debts. To the extent that the payments in question were in discharge of proper claims against the estate of deceased the claim for reimbursement made in behalf of the estate of the executrix is sustained and all relevant objections thereto are overruled *pro tanto*. Not all of the items for which reimbursement is sought are proper charges to deceased's estate. The court disallows all claims for reimbursement for payments by the executrix for her hotel, traveling and unparticularized "miscellaneous" expenses. These aggregate $2,622.39. Her estate's claim, therefore, stands allowed only as to the balance of $1,912.99.

Specific disposition of objections may now be made in the light of the foregoing general rulings of the court.

(Specific rulings on objections which are not of general interest are omitted.)

Submit, on notice, decree settling the account accordingly.