In the Matter of the Estate of JACOB P. GALEWITZ, Deceased. HANNAH GALEWITZ et al., Appellants-Respondents. CHASE NATIONAL BANK et al., as Executors of JACOB P. GALEWITZ, Deceased, et al., Respondents-Appellants.

First Department, March 12, 1957.

*Samuel R. Weltz* of counsel (*Milton B. Franklin* with him on the brief), for Hannah Galewitz, appellant-respondent.

*Edward R. Finch,* special guardian for infants, appellant-respondent.

*George Green* for executors, respondents-appellants.

*James N. Vaughan* of counsel (*Vaughan & Lyons,* attorneys), for Samuel Galewitz, respondent-appellant.

BREITEL, J. P. Jacob Galewitz died in 1950, leaving an estate to be divided among his second wife and six children. Four of the children are the issue of an earlier marriage. He left a will creating trusts to be formed for his wife and infant children, with remainders and outright bequests to the adult children. As we shall see, the estate, according to Federal tax appraisal, after debts, aggregated $1.8 million.

Bulking large in the estate, however, was his two-thirds stockholding in the Clinton Paper Corporation. In this corporation he had held, since 1923, his wholesale newsprint jobbing business, and sundry real estate and other investments. One third of its stock was held by his older son, Samuel, as a result of a gift from the father, in 1933, when the son was 21. The son has been active in the father's business all his adult life, and has been its actual operating head since the father's death.

The father and son, in 1947, had entered into a written agreement, under which, if either died, the survivor was to have the option to purchase the shares of the other, at a price determined

by a court-appointed accountant. The price was to be determined by valuation of the corporate assets as of the time of death, under a formula which used book values and liberally discounted various classes of assets. Moreover, the buyer was permitted to pay the balance of the purchase price, by monthly installments with interest at 4%, over a period of 10 years, after a down payment of 20%.

The effect of this option was to benefit the buyer in extraordinary ways, not only because the price was a discounted one as compared with ordinary standards of valuation, but because, in all likelihood, if the business maintained its profits, the price could be paid out of future earnings.

In an earlier proceeding, the widow of Jacob Galewitz attacked the option as illusory, and in violation of her widow's rights, under section 18 of the Decedent Estate Law. The contract was held valid and enforcible (206 Misc. 218, affd. 285 App. Div. 947, motion for leave to appeal denied 285 App. Div. 1049).

But the litigation, largely the effort of the widow, was effective in delay, even if she gained no ostensible successes.*

---

* The chronology is as follows:

Jacob Galewitz, decedent, died, October 10, 1950.

Will offered for probate, October 17, 1950.

Widow opposed probate on ground of Florida domicile, November 14, 1950.

Will admitted to probate, reserving question of domicile, February 26, 1951.

Widow appealed, and stay of appointment of executors granted, February 27, 1951.

Probate affirmed by this court, May 29, 1951. (278 App. Div. 826.)

This proceeding was started, August 16, 1951.

The widow answered the petition, September 27, 1951.

An accountant, pursuant to the provisions of the option, was appointed by the Surrogate, January 3, 1952.

The accountant filed his report, June 19, 1952.

Exceptions were filed to the accountant's report, by both sides, October 15 and 22, 1952.

Validity of the option was tried, April 21, 1953, and December 9, 1953.

Surrogate determined the option to be valid, May 3, 1954.

Interlocutory decree was entered on the decision of the option's validity, June 29, 1954.

Widow and special guardian appealed, July 23 and 27, 1954.

Federal tax authorities appraised Clinton shares and assessed tax deficiency, November 24, 1954.

The interlocutory decree upholding validity of the option was affirmed by this court, March 29, 1955.

Pursuant to application, leave was granted to executors to file supplemental answer, in view of Federal tax appraisal and assessment, August 18, 1955.

This proceeding went to trial on remaining issues, September 6 and 12, 1955.

Surrogate rendered his decision, December 9, 1955.

Final decree was entered, July 9, 1956.

Now, more than 6 years since the death of decedent, his son has tendered the down payment for his father's shares, pursuant to the option, at the contract formula price of $600,000 odd. In the meantime, the corporation has accumulated undistributed earnings of approximately $400,000. On the other hand, the Federal Estate Tax proceedings resulted in a determination that the Clinton shares were worth $1.3 million, and a tax deficiency has been assessed in the amount of $422,505.45 on the excess of the value over the option price.

The following critical issues are raised: (1) Has the son the right to unqualified specific performance on the contract, heretofore held valid and enforcible, in the light of the tax impact on the estate; (2) Is the son or the estate entitled to two thirds of the earnings of the corporation, represented by the estate's shares, from date of testator's death to the date, in 1956, when the son made the down payment for the shares held by the estate; (3) Should the son or the estate bear the estate tax burden on the difference in value, as found by the court-appointed appraiser under the option formula, of the father's shares at the time of his death and the ultimate Federal Estate Tax appraisal of those shares; and (4) Should various accrued tax liabilities, "not stated on the records" of the taxing authorities, and owing by Clinton and its subsidiary corporations, be accrued or ignored in computing the option price of the Clinton shares? There are other questions raised on this appeal, but, since as to those the determination of the learned Surrogate will not be disturbed, it is not necessary to discuss them.

Embattled, in various combinations, over these issues are the surviving widow, the special guardian for the infant children of the second marriage, the executors of the estate, and of course — the son, Samuel Galewitz, buyer of the shares under the option contract, and also, one of the executors. Accentuating the concern of the parties with these issues, is the fact that the estate, inclusive of the Clinton shares, amounts only to $1.8 million, as appraised by Federal tax authorities. Again, taking Federal tax appraisal, the Clinton shares are worth $1.3 million. The right to accumulated corporate earnings of $400,000, or the incidence of the tax burden, also about $400,000, compared with the option price of $600,000 odd, may have dramatic effect on the size of the net estate, after taxes and after sale of the Clinton shares, depending on how these issues are resolved.

In resolving these issues, rules of law are to be applied, and equities, as they appear in the record, are to be accorded recognition. A governing principle is that the contract is to be

enforced, according to its tenor, and the ascertainable intent manifested by the parties. The father, during his lifetime, had the right to transfer the Clinton shares, so long as it was not illusory, or in prohibited evasion of the widow's rights. At the same time, whatever acts were done were necessarily subject to the tax laws, and, as a matter of law, done in contemplation of them. Of similar valid reference are laws designed to control the incidence of taxes on estates and transferees of assets from decedents' estates. The equity powers of the court may be used to accommodate — equitably — these principles to each other, but not to remake the basic contract, or to assume to redistribute testator's estate, free of the limitations imposed by his will or his valid contracts. (See, generally, *Gordon* v. *Mazur,* 284 App. Div. 289, 292–294; *Brody* v. *W. & L. Enterprises,* 4 Misc 2d 907, affd. 281 App. Div. 867; 81 C. J. S., Specific Performance, § 158, subd. a.)

The Surrogate, on the first issue enumerated above, held that the son's right to specific performance of the option had been previously and fully determined by him, and that such determination had been affirmed in this court.

As a matter of fact, in the first instance, the son had petitioned merely for the appointment of an accountant, in accordance with the option. While the proceeding was pending, he filed claims and exceptions with respect to the accountant's report, and in the same notice, he added, for the first time, a request for specific performance. In the ensuing interlocutory decree, there was a recital that the son had petitioned for specific performance, but the decretal provisions were limited to holding the contract valid and enforcible. The last decretal provision held in abeyance all other questions.

In the meantime, the appeal from the interlocutory decree was prosecuted, and, as noted earlier, it was affirmed. The essential holding, therefore, was that the contract was valid and enforcible, but this did not, of necessity, indicate that the son was entitled to unqualified specific performance. True, the designation of the accountant by the Surrogate, pursuant to the contract, depended upon the validity of the contract; but the mere designation of an accountant-appraiser was merely a preliminary step to fixing obligation under the contract. Conceivably, any other person might have been given the power, under the contract, to designate the accountant-appraiser. The right to ultimate and full specific performance did not follow as of course. Indeed, equity need not speak with finality until the decree, and when it does, it does with reference to the facts, the law, and the equities then existing. (*Peck* v. *Goodberlett,* 109 N. Y. 180, 189;

*Bloomquist* v. *Farson,* 222 N. Y. 375, 380.) In any event, the question is not of critical importance, because, as shall be seen, the son's obligation to bear the apportioned estate tax burden is one that may be imposed upon him directly, independent of the power to condition the grant of specific performance.

Since the contract is valid, and since it relates to the unique property in the shares of this close corporation, the son's remedy should be that of specific performance. But, when he invokes that remedy, he subjects himself to all of the powers of the court, and its obligation, to assure that equity is done to all parties. There is no difficulty, therefore, in reaching the conclusion that, in granting the son specific performance, there is no lack of power to condition that specific performance on the satisfaction of any incidental obligations arising from this unusual transaction. (*Mechanics Bank of Alexandria* v. *Lynn,* 1 Pet. [26 U. S.] 376, 383; see *Matter of Lipschutz* [*Gutwirth*], 304 N. Y. 58, 63; 2 Story on Equity Jurisprudence [14th ed.], §§ 1026–1027.)

We turn now to the second question of who, as between the estate and the son, that is, the seller and the buyer of the Clinton shares, is entitled to the earnings of the corporation accumulated between decedent's death and the making of the down payment pursuant to the option. The Surrogate held that the earnings inured to the benefit of the estate, and provided, by his decree, that the apportioned earnings, $385,000 at the time of the hearings, but now greater, should be added to the price required to be paid by the buyer. With this conclusion this court cannot agree.

Initially, there should be considered the nature and origin of these earnings. Clinton, through most of the years, had been a successful business. But, in the mid-forties it made an unusual newsprint contract, with an indicated over-all profit, somewhere in the neighborhood of $800,000. These profits began to appear in the corporate financial statement for 1947. This resulted in a swollen surplus of undistributed earnings, even before the death of decedent. It was also in 1947, that the father and son, the decedent and the buyer, entered into the written option contract. It is evident, then, that the parties contracted with conscious reference to this highly profitable newsprint contract. A bonanza for the corporation, if that is what it was, was completely anticipated for the current year, 1947, and ensuing years.

Turning to the language of the option, it provides that the executors retain security title to the shares, until the purchase

price is fully paid. It is not disputed that the buyer takes an equitable ownership in the shares, at least when he makes the 20% down payment. Since the taking of equitable title is not choate until then, the parties adverse to the buyer contend that the seller is entitled to the intermediate corporate earnings. The buyer, on the other hand, contends that he takes title then, but that it relates back to the death of decedent.

The option requires valuation of the corporation, for purposes of determining the option price, as of the date of death of the decedent. Specifically, with reference to particular assets, such as listed stocks, unlisted stocks, and inventory, value as of the time of death is stipulated. Indeed, no one claims that any capital accretion in any of these assets, before " title passes ", should redound to the benefit of the seller, but rather all agree that the buyer is entitled to it.

Looking to the other side of the coin, the option provides for the dating of the installment notes, and the running of interest thereon at 4%, from the time of the 20% down payment by the buyer. Usually, the right to increments on a purchased asset and the running of interest on the unpaid purchase price are concurrent. (*Currie* v. *White,* 45 N. Y. 822.) Of course, this arises, not as a matter of law, but as a matter of contract, express or implied; the parties are quite free to agree otherwise. Then, too, the option provides that dividends paid by the corporation are to be applied to the purchase price. Nothing is expressly said with respect to dividends which might be paid prior to the making of the down payment and after the death of decedent. Of course, no dividends were paid during this period; and all the interested parties agreed that this should be the case.

It is rather clear, then, from what is contained in the contract, and from what is omitted, that the father and the son did not contemplate, and therefore did not contract with respect to, any extended delay between the death of either of them and the effective exercise of the option by the survivor. As a consequence, the principles applicable to ordinary contracts must be applied, without reference to any views which strangers might have as to how this estate should be distributed, or this contract performed. In no event can a court interpolate the contract, by increasing the price for the shares by the amount of the corporate earnings allocable to them.

The contract, in speaking of the purchase price being fixed with reference to the time of death, rather clearly indicates that the time of death is the time fixed for the determination of the rights of the parties. There is relation back. It is immaterial

when title, in fact, passes to the Clinton shares. The distinction is not unlike that between the actual date of an instrument and its stipulated effective date.

Moreover, construing the stipulation in the contract fixing the time of valuation as determining the relation back is in accordance with the intent of the parties, as well as the tenor of their contract. (Personal Property Law, §§ 99, 100; *Currie* v. *White,* 45 N. Y. 822, *supra.* Cf. *Leeds* v. *Fried & Sons,* 281 App. Div. 851, revg. 117 N. Y. S. 2d 400; *Matter of Gaines,* 4 Misc 2d 935, affd. 190 App. Div. 941.) No one would seriously dispute this, if the litigation had not unduly delayed exercise of the option.

Indeed, in the common " buy-sell " contract, arising in close corporations, such as this one, it is almost universally contemplated that control should pass to the survivor at the time of death of the decedent. Frequently, the purpose of maintaining continuity in a going enterprise can only be thus served. As a consequence, the chances of profits — or losses — is intended to be borne by the survivor-buyer. In this way, the survivor is charged with the management and risk of his own money, and the decedent's estate becomes entitled to a determinative value fixed as of the date of death — secure against the business risks but thereby also shorn of the right to future profits.

So, the cases relied on by the parties adverse to the buyer, and by the Surrogate, are irrelevant. These are cases which allocate the burden of risk from loss or destruction, between the buyer and seller, depending upon when title has actually passed.* Similarly irrelevant are the rules and the cases ** which hold that in a sales contract, when the price is yet to be determined, that the obligation of the buyer does not become fixed until the price is, in fact, determined. Of course, the obligation of a seller and buyer is, generally, not fixed until the price is determined in accordance with the provisions of the contract. But the question in this case is whether, when the price is finally determined in accordance with the provisions of the contract, there is relation back of title to time of death.

Since, however, the delay has occurred, it is necessary to examine the option and surrounding circumstances to see if some rational implication may be evolved. Certainly, the parties

---

\* *Sayour & Co.* v. *Stevens & Co.,* 205 Misc. 807; *Donner* v. *Associated Lace Corp.,* 277 App. Div. 697, affd. 303 N. Y. 719.

** 1 Williston on Sales [Rev. ed.], § 174, p. 449; *Pfeiffer* v. *Berke,* 4 Misc 2d 918. A reading of the entire discussion by Williston, *op. cit.,* is in accord with the analysis which follows above, except that it is done largely in terms of " when title passes ".

contemplated rapidly accruing profits from the major newsprint contract held by the corporation. They must also have contemplated that there would be some delay between the date of death and the making of the down payment by the buyer. The delay would be at least as much as six months, and it would not be very unusual if the delay were as much as a year. Despite this foreseeable delay, no provision was made therefor. To that extent we may not make implications, where the parties have, by obviously conscious omission, contracted otherwise.

On the other hand, the parties obviously did not contemplate a delay of six years. That delay resulted from litigation over the validity of the contract and the decedent's domicile, as well as over the report of the accountant-appraiser. Under these circumstances, surely it is difficult to vary, nor is there justice in varying, to the detriment of the buyer, the impact of the contract unequivocally fixing the time of death for valuation, and therefore, of relation back. So too, a contrary view would reward a litigious seller for delaying the sale, provided he anticipated earnings and the price was no longer attractive.

Moreover, we may not wholly ignore the corporate entity in considering this contract. The subject matter of the contract is not the assets of the corporation, but two thirds of its outstanding shares. True, the value of the shares was to be fixed by reference to the assets of the corporation, a common enough practice, but the shares and not the assets were the subject of the sale. As noted earlier, the parties were aware of rapidly accruing earnings, and the possibility of losses, and they must have been aware that capital gains were a possibility, and capital losses, too. For none of these was provision made to adjust in the event of delay in consummating the option, nor may we imply such a provision against a buyer, substantially not at fault, insofar as the delay is concerned.

As a consequence, it is held that there was no power, by decree, to add the value of the intermediate earnings of the corporation to the purchase price for the Clinton shares.

Before passing from the question of the intermediate earnings, it is noted that an incidental effect is that the buyer has not been obliged to pay any part of the purchase price for six years, although he will be entitled to certain rights of ownership from the date of his father's death. Equitable considerations suggest that a buyer in that situation should be obliged to pay interest, at the contract rate, for the extended period in which he was permitted to withhold the purchase price or any payments on account thereof. (Cf. *Currie* v. *White,* 45 N. Y. 822, *supra.*) All the parties have assumed, however, that, since the

contract provision for interest is found only with reference to installment notes dated from the time of the down payment, such dating is conclusive on this question. That may be, and since the point has not been suggested, this court does not pass upon it.* But interest on the delayed purchase price is one thing; reallocation of the intermediate earnings in disregard of the corporate entity, and in still greater disregard of the contract that the survivor should take the shares as of the date of death, is quite another.

We now reach the third question to be considered, namely, should the estate or the son, that is, the seller or the buyer, bear the burden of the Federal estate tax deficiency, assessed on the estate for the excess value of the Clinton shares. The Surrogate held that the estate must bear that burden.

As observed earlier, the option price, as eventually determined, is in the neighborhood of $600,000. The actual amount is greater than that, but precisely how much greater depends on the treatment of various exceptions to the accountant's report. Apart from valuation under the option formula, the accountant found the Clinton shares to be worth just over $1 million. The difference is accounted for by the "built-in" discounts and the use of book value, in the option formula. The Federal taxing authorities have appraised the Clinton shares at roughly $1.3 million, and assessed the estate — the seller — for a tax deficiency of $422,505.45.

The parties adverse to the buyer promptly sought relief from the Surrogate by directing apportionment of this additional tax on the buyer, under section 124 of the Decedent Estate Law.

---

* But cf. *Sunset Motors* v. *Rettmer,* 281 App. Div. 682, affd. 305 N. Y. 904, where the court conditioned specific performance of a real estate contract on payment of interest on the purchase price, not otherwise provided in the contract, because the buyer had had the use and possession of the premises. See, also, *Watters* v. *Ryan,* 31 S. D. 536; *Sanford* v. *Smith,* 4 Misc 2d 820, affd. 273 App. Div. 928; *Kurth* v. *Hauser,* 262 Wis. 325. See, generally, Pomeroy on Specific Performance (3d ed.), §§ 429, 430; 81 C. J. S., Specific Performance, § 162, subd. d.

A careful analysis of the authorities reveals that the incidence of the rule as to interest on the purchase price is largely, but not exclusively, in transfers of real property. In any event, the rule is never so expressly limited.

A further possibility, for placing parties in the position which had been contemplated in the making of the contract, would be to require interest on the down payment for the period of undue delay, and the dating and paying of the installment notes from the beginning of such period. This would result in the notes being paid off, as if the notes had been executed and delivered when they should have been, if the undue delay had not occurred. There may be other possibilities within the reach of equity to accomplish the intent of the parties and yet enforce the basic contrast.

The statute, in the absence of provision in the will or other instrument to the contrary, directs apportionment of estate taxes on transferees from the estate. They argued that the tax deficiency was solely the product of the difference in value of the Clinton shares from the option formula price, and, therefore, the buyer, as the transferee of a benefit from the estate in excess of the price, should bear the tax burden thereon. They also pointed out that, if the estate must bear the tax deficiency, it would diminish the net estate to a tiny fraction of its original size. It would certainly wipe out two thirds of the already discounted option price.

In holding as he did, the Surrogate reasoned that the buyer was not one interested in the estate, within the meaning of subdivision 10 of section 314 of the Surrogate's Court Act but a creditor. As a creditor, it was held section 124 of the Decedent Estate Law did not apply to the buyer. Relied on were earlier cases,* all but one of which involved *inter vivos* trusts effected by the testator in behalf of a separated wife in connection with settlement agreements. The exception** also involved an *inter vivos* trust of life insurance; but the estate tax *was apportioned* to that trust, in order that creditors of the estate should not bear the tax burden.

The cases relied on may be sound law, but are irrelevant. Subdivision 10 of section 314 of the Surrogate's Court Act, defines persons interested in the estate as those entitled to share in the estate, and expressly excludes from the definition " a creditor ". Within the meaning of that section, persons, entitled to interests in the estate by virtue of contract, are creditors. Hence, within the language and the purpose of section 314, the buyer in this case is " not interested in the estate," but is a creditor.

When we turn to section 124 of the Decedent Estate Law, however, we are concerned with a different statute, with an entirely different purpose. Here, the reference is not to the " estate " generally, nor is there a specific exclusion of creditors. The statute refers to " any property required to be included in the gross tax estate " under the laws of the State of New York or of the United States, and mandates apportionment of the estate or death tax imposed on such property among

---

* *Matter of Brokaw,* 180 Misc. 490, affd. 267 App. Div. 811, affd. 293 N. Y. 555; *Matter of Strebeigh,* 176 Misc. 381; *Matter of Oppenheimer,* 166 Misc. 522; *Matter of Cordier,* 1 Misc 2d 887; *Matter of McKeon,* 4 Misc 2d 931. But see *Per Curiam,* and especially dissenting opinion by DESMOND, J., in *Matter of Brokaw* (293 N. Y. 555, 558, *supra*).

** *Matter of Oppenheimer, supra.*

the persons "interested in the gross tax estate" to whom such property is or may be transferred or to whom any benefit thereon accrues. (*Matter of Zahn,* 300 N. Y. 1, 8; *Matter of Gross,* 204 Misc. 804, 807.) *

An ordinary bona fide creditor does not become subject to the apportionment of section 124, because his interest is deductible from the gross tax estate (Tax Law, § 249-c.). With respect to the separated wives, involved in the cases mentioned above, the trusts in their behalf arose, arguably, by reason of contractual settlement of economic obligations between husband and wife. In the case of the ordinary bona fide creditor, as defined by the tax statutes, by virtue of every definition, there can be no "excess value" passing to the transferee, which would be subject to estate taxes. With respect to the negotiated settlement trusts for separated wives, earlier discussed, parallel reasoning had been applied, whether correctly or not is not material to this case.** In each such case, the transferee is taking exactly what he is entitled to under contract in equal value to that which, presumably, could be charged to, and, therefore, deducted from, the gross estate. (See Tax Law, § 249-b.)

The Tax Law, to some extent, operates independently of the law of contracts and the laws affecting the distribution of estates. (*Matter of Ryle,* 170 Misc. 450.) So it is that in the law of contracts we do not, generally, evaluate the fairness or adequacy of the consideration, while in tax law, to prevent evasion or undesirable diversion of revenues to government, the adequacy of consideration may be closely scanned. Thus, to be a tax-free transfer under the Tax Law there must be " a bona fide sale for an adequate and full consideration in money or money's worth " (Tax Law, § 249-b, subds. [c], [i]). This is a vastly more restrictive limitation than obtains in the law of contracts. Where the transfer does not meet the restrictive tax law test, the inclusion in the gross tax estate is only of the " excess of the fair market value at the time of death of the property otherwise to be included on account of such

---

* Before the 1950 amendment to section 124, it expressly provided: " For the purposes of this section the term 'persons interested in the estate' shall have the same meaning with respect to both state and federal taxes as is given it by section two hundred forty-nine-m of the tax law." (L. 1940, ch. 829, § 13.)

The 1950 amendment was described by its sponsors so: "Its purpose is to clarify the principles and procedure relating to estate tax apportionment." (L. 1950, ch. 822, p. 2282, N.)

** See *Per Curiam* opinion, and dissenting opinion by DESMOND, J., concurred in by LEHMAN, Ch. J. and LOUGHRAN, J., in *Matter of Brokaw,* 293 N. Y. 555 (*supra*).

transaction, over the value of the consideration received therefor by the decedent" (Tax Law, § 249-b, subd. [i]). The Federal statutes are similar (U. S. Code, tit. 26, §§ 2035, 2043).

The finding of excess market value of the Clinton shares by the Federal taxing authorities is precisely what happened in this case. Here, the option was valid and enforcible, according to its tenor, in the law of contracts; but this was not binding on the taxing authorities, least of all on the Federal taxing authorities. (*Matter of Cory,* 177 App. Div. 871, affd. 221 N. Y. 612; *Matter of Orvis,* 223 N. Y. 1; cf. *Matter of Fieux,* 241 N. Y. 277.)

Once the estate tax is duly imposed on the excess value, we look to section 124 of the Decedent Estate Law to ascertain the impact of the tax. Section 124, by its very terms, has the purpose and effect of allocating tax burdens. It is ancillary to the tax laws in their effect on decedents' estates. It is not primarily designed to enforce the laws of contract or those governing distribution of decedents' estates. (*Matter of Ryle,* 170 Misc. 450, 453, *supra; Matter of Kaufman,* 170 Misc. 436, 440, 443.)

On this analysis, section 124 directs the apportionment of taxes assessed on the excess value of the Clinton shares on the buyer, the person "benefited" by the transfer of that excess value. (Cf. *Matter of Mayer,* 174 Misc. 917.) This does not impair the buyer's obligation, because the parties, as a matter of law, must have contracted with reference to, and in contemplation of, the tax laws and their impact, when the transfer was to take effect. (*Matter of Ryle, supra.*) Moreover, section 124 places the duty to pay the apportioned tax directly on the transferee, and provides for its enforcement (§ 124, subd. 5).

On this view, the validity of the option and its method of price-determination are given complete effect. The tax laws are also not denied, as they may not be. The tax apportionment statute is given the very effect that its plain language requires. The apportionment statute refers to apportioning the tax on "such property" among those "to whom such property is or may be transferred or to whom any benefit therein accrues" (Decedent Estate Law, § 124, subd. 1). This applies to the Clinton shares and their buyer, not to the seller, the estate.

The point, put still another way, is that while the option is valid in contract law, its status tax-wise is not that of a bona fide sale contract, but of a transfer, part-sale, and part-gift. As to the part-gift the tax is imposed, and, therefore, appor-

tioned to the part-donee. (*Matter of Cory*, 177 App. Div. 871, affd. 221 N. Y. 612, *supra*; *Matter of Orvis*, 223 N. Y. 1, *supra.*)

Since the Federal tax deficiency is being litigated by the estate in the Federal courts, it is not yet final. The estate, however, is entitled to assurance from the buyer that the tax, when finally determined, will be paid by him. This, equity has power to accomplish. Moreover, the statute expressly authorizes such assurance from transferees (Decedent Estate Law, § 124, subd. 6).

We reach now the last question to be discussed: Should various income and excise tax liabilities "not stated on the records" of the taxing authorities, and owing by Clinton and its subsidiary corporations, be accrued or ignored in computing the option price of the Clinton shares?

The contract provides, with respect to valuation of the corporation, that: "in computing, the liabilities of the Corporation, any and all Federal, State, and municipal taxes shall be included as liabilities for the purposes of this agreement at the amount stated on the records of Federal, State, and municipal offices." In applying this provision, the accountant-appraiser set up a reserve of $63,167.85 for income taxes, which had not yet been assessed, but which had been accruing, and which, eventually were paid. The objection to the inclusion of this reserve as a liability to be deducted from the assets of the corporation, was overruled. The case of *Aron* v. *Gillman* (309 N. Y. 157) was relied upon.

The reserve should not have been set up. The option plainly states that tax liabilities are to be included in the amounts "stated on the records" of the taxing offices. This is a reasonable and logical alternative way of determining tax liabilities, regardless of what the eventual liabilities may be. In any event, that is the contract. (*Soechtig* v. *Amick*, 285 App. Div. 701, affd. 309 N. Y. 988.)

The *Aron* case is not in point. In that case there was also involved an agreement to buy out a survivor's shares in a corporate business. The method for determining the value of the shares was "book value * * * determined by the most recent audit". As a consequence, the Court of Appeals decided that an audit involved more than a mechanical computation of entries in the books of the corporation. It held that the audit had the very purpose of verifying and reconciling the book entries to proper accounting practice. Such proper accounting practice, it found, required the creation of a reserve for income taxes which, although not payable until the end of the year, were inexorably accruing. It was pointed out that the

agreement had not limited itself to the mere use of the term "book value". In our case there is an equivalent limitation, namely, that the tax liabilities are to be determined by what is stated on the records of the taxing offices. (See *Soechtig* v. *Amick, supra*.) Consequently, the reserve of $63,167.85 should not have been used to reduce the value of the Clinton shares. ·

Accordingly, the following modifications of the decree are required: (1) Petitioner is entitled to specific performance of the option at the valuation determined, without addition of the intermediate earnings of the corporation, from the date of death to the making of the 20% down payment on the option, but increased by an amount equivalent to the reserve for accrued income tax liabilities which were erroneously deducted from the assets of the corporation, and conditioned upon the petitioner providing sufficient assurance that any tax liabilities, Federal or State, which may be imposed finally on the estate as a result of the excess value of the Clinton shares, over and beyond the option price, shall be paid when due by petitioner; and (2) without prejudice to the executors or other persons interested in the estate, if they feel so advised, to make application to the Surrogate to require, as a further condition to specific performance of the option, the imposition of interest (on the right to or manner of which this court does not now pass) e.g., at the contract rate of 4% on the purchase price, under the option, or the antedating of installment notes, for the period of undue delay, or from the date of death, whichever may be appropriate.

The decree should be modified, on the law, as indicated, with costs and disbursements to each of the parties filing briefs herein, payable out of the estate. Settle order.

VALENTE, MCNALLY and BASTOW, JJ., concur.

Decree unanimously modified in accordance with the opinion herein and, as so modified, affirmed, with costs and disbursements to all parties appearing and filing briefs herein, payable out of the estate. Settle order on notice.